UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANACOSTIA WATERSHED SOCIETY, et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA WATER AND | ) | Consolidated |
| SEWER AUTHORITY, and THE DISTRICT | ) | Civil Action No. 1:00CV00183TFH |
| OF COLUMBIA, | ) | |
|     Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA WATER AND | ) | |
| SEWER AUTHORITY, et al., and THE | ) | |
| DISTRICT OF COLUMBIA, | ) | |
|     Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO ENTER
FIRST AMENDMENT TO 2005 CONSENT DECREE**

**Table of Contents**

INTRODUCTION: ................................................................................................ 1

I.     STATUTORY AND REGULATORY BACKGROUND. ...................................... 4

II.    PROCEDURAL AND FACTUAL BACKGROUND. ........................................ 7

III.   THE PROPOSED FIRST AMENDMENT ......................................................... 12

IV.    OVERVIEW OF COMMENTS ........................................................................... 15

V.     THE PROPOSED FIRST AMENDMENT SHOULD BE ENTERED BECAUSE
       IT IS FAIR, REASONABLE, CONSISTENT WITH THE CLEAN
       WATER ACT AND IN THE PUBLIC INTEREST. ............................................ 20

       A.    STANDARD OF REVIEW ........................................................................ 20

       B.    THE PROPOSED AMENDMENT IS PROCEDURALLY AND
             SUBSTANTIVELY FAIR. ......................................................................... 22

       C.    THE PROPOSED AMENDMENT IS REASONABLE. ............................... 24

       D.    THE PROPOSED AMENDMENT IS IN THE PUBLIC INTEREST. ........ 26

       E.    THE STANDARD IN SECTION VII DOES NOT APPLY HERE. ............ 27

VI.    NOTHING IN THE CITIZENS' COMMENTS WARRANTS REJECTION OF
       THE FIRST AMENDMENT. ............................................................................... 29

       A.    THE FIVE-YEAR EXTENSION IS JUSTIFIED AND DOES NOT BAR
             ENTRY OF THE CONSENT DECREE. ..................................................... 30

       B.    THE TERMS OF THE AMENDMENT ARE CLEAR AND
             ENFORCEABLE AND THE PARTIES SHOULD BE PERMITTED TO
             LEAVE DETAILS TO PLANS TO BE SUBMITTED AFTER ENTRY OF
             THE PROPOSED AMENDMENT. .............................................................. 31

       C.    THE DECREE SHOULD BE ENTERED UNCONDITIONALLY SO THAT
             EXPEDITIOUS IMPLEMENTATION CAN BEGIN. ................................. 33

VII.   SUMMARY ......................................................................................................... 35

CONCLUSION ........................................................................................................... 35

i

**INTRODUCTION**.

In 2005, Plaintiff United States, the District of Columbia Water and Sewer Authority ("DC Water")[1] and the District of Columbia ("District" or "DC") agreed to a Consent Decree to reduce the frequency and volume of polluted wastewater discharged from local sewers into the Anacostia and Potomac Rivers and Rock Creek, which the Court entered after a period for public comment. Rec. Doc. 100 ("2005 Consent Decree"). The United States now moves to enter a proposed First Amendment[2] to the 2005 Consent Decree in which the parties agree to substitute Green Infrastructure ("GI") for a portion of the tunnels and other technology selected in the 2005 Consent Decree for the Potomac River and Rock Creek sewersheds.

Roughly one-third of the District is served by a combined sewer, which collects both stormwater and sewage and other pollutants in the same system and conveys the wastewater to the Blue Plains Advanced Treatment Plant ("Blue Plain" or "Blue Plains ATP") in southwest DC. There it is treated to remove nitrogen and other nutrients, solids, floatables and pathogens such as *e coli*, and discharged to the Potomac River where it flows to the Chesapeake Bay. In periods of intense storms and precipitation, however, the combined sewer system ("CSS") may not have sufficient capacity to convey all flows to Blue Plains. Thus it is designed to overflow at designated, permitted outfalls ("Combined Sewer Outfalls" or "CSOs") into Rock Creek, the Anacostia River, and along the Potomac waterfront from north of Key Bridge to the Kennedy Center, in order to avoid back-ups into homes or flooding of local streets.

---

[1] This agency has sometimes been referred to as "WASA," which is the term used in the 2005 Consent Decree.

[2] Rec. Doc. 115-1 will be referred to simply as the First Amendment or Amendment. Appendix F to the proposed Amendment, Rec. Doc. 115-7, contains most of the provisions pertaining to Green Infrastructure and will be referred to as Appendix F.

The 2005 Consent Decree obligated DC Water to design and construct massive, underground storage tunnels to hold contaminated wastewater during storms and wet weather, as well as associated pump stations and other appurtenances, to reduce CSO discharges. All of these capital investments are collectively known as "Gray Infrastructure." Work under the 2005 Consent Decree is proceeding successfully: DC Water has designed the facilities for the Anacostia sewershed and is in the process of constructing those CSO controls.

The 2005 Consent Decree also required DC Water to promote another approach to CSO Control, called Green Infrastructure or "GI," in the District.[3] Green Infrastructure refers to technologies that store or detain runoff of stormwater, or otherwise promote infiltration or evaporation of water, so that it does not surge into the CSS during wet weather. GI measures include green roofs, stormwater gardens, rain barrels, swales, permeable pavement, and similar technologies. DC Water agreed to implement a number of small GI pilot projects on its own property, and to take into account data concerning GI as it designed the tunnels for Rock Creek and the Potomac sewersheds. *See,* Rec. Doc. 100 (2005 Consent Decree), Section VII, pp. 27-28. DC Water, in coordination with the District government, has done so.

On May 19, 2015, the United States lodged the proposed First Amendment with the Court for a period of public comment, under which DC Water agrees to:

- Replace a 9.5 million gallon tunnel in the Rock Creek sewershed at Piney Branch Outfall 49 with GI, which  will control a volume of rainfall equivalent to 1.2" on 365 acres of impervious surface;

- In the Potomac sewershed, adopt a hybrid approach of Gray and Green Infrastructure and

  - Reduce the size of the Potomac tunnel from 58 million gallons to 30 million gallons of storage;

---

[3] Note that in the 2005 Consent Decree, it was called "Low Impact Development Retrofit" or LIDR.

- ○ Design and construct GI sufficient to control a volume of 1.2" rainfall on 133 impervious acres in the Potomac sewershed;

- ○ Perform limited separation of the basins leading to two CSOs along the Georgetown waterfront; and

- Implement other engineering modifications, including using gravity instead of a pump station for the flow from the Potomac tunnel to the Blue Plains tunnel.

The proposed First Amendment also grants DC Water a five-year extension to certain deadlines in the original agreement.

During the period for public comment, the United States received approximately 70 comments from environmental groups, an industry association, and local residents and individuals. Virtually all commenters support GI and do not ask the Court to reject the proposed Amendment; indeed, a number strongly support its entry. Most notably, they object that the five-year extension to complete the Potomac tunnel and to install the GI projects is unwarranted and unjustified. At the same time, they suggest changes to address perceived deficiencies in the proposed plan, even though many of the changes, in the view of the United States, either are not realistically attainable or at best would have required much additional time to negotiate, unnecessarily engendering yet more delay.[4]

After careful review of all of the comments, the United States continues to believe that the First Amendment meets the legal standards for entry and is in the public interest. The provisions of the First Amendment, including the GI program contained in Appendix F, describe an enforceable and workable program that provides deadlines for more detailed plans to be

---

[4] The commenters criticize the proposed First Amendment based on concerns about the Parties' lack of advance planning, their alleged failure to analyze the availability of public and private space, a perceived need for more up-front specificity in required plans such as maintenance plans, a perceived need for more checkpoints and future public comment, an alleged need to spell out contingent CSO controls if the equivalent CSO reductions are not achieved, and similar concerns about future implementation issues.

submitted pursuant to the same process of approval and dispute resolution contained in the original 2005 Consent Decree. And, given the complexity and scale of the proposed GI, and for the other reasons set forth below, the five-year extension is justified.

Courts disfavor rejection of a voluntary settlement agreed to by the Parties, which may needlessly risk a return to litigation. In reviewing settlements, courts need not resolve the merits of the claims, nor should they substitute their judgment for that of the settling parties, but rather they need only determine that the settlement is fair, reasonable, and in the public interest. Here, many of the difficult issues – the initial schedule, the amount of CSO reduction, the overall purpose of the Consent Decree – were resolved in the 2005 settlement. As shown in Section V below, the proposed First Amendment satisfies the legal standard for entry of judicial consent decrees. The United States responds to each comment in the Response to Comments, Exhibit 1 to this Memorandum, and in Section VI below, and shows that nothing in the comments and objections warrants rejection of the Parties' voluntary and consensual agreement. Given the overall support for GI, the Court should not require the three Parties to reopen negotiations, with uncertain results, but rather should enter the proposed First Amendment so that the proposed measures can be commenced expeditiously.

## I.    STATUTORY AND REGULATORY BACKGROUND.

The Federal Water Pollution Control Act, 33 US.C. § 1251 *et seq.* ("Clean Water Act" or "CWA") makes it unlawful for any person to discharge any pollutant from a point source into waters of the United States except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued by EPA or an authorized state. 33 U.S.C. §§ 1251(a), 1311(a), 1342, and 1362. An NPDES permit typically contains limitations on the amounts and types of pollutants that may be discharged (*i.e.*, effluent limitations), and

requirements for monitoring and reporting of discharges.  EPA has not authorized the District to

issue CWA Permits and so EPA issues the NPDES Permit for the District. Pursuant to CWA

Section 309(b) and (d), 33 U.S.C. § 1319(b) and (d), the United States may enforce NPDES

permits through civil actions for injunctive relief and civil penalties.

    In addition to the general CWA provisions described above, Congress has provided more

specific direction to EPA regarding CSOs.  In 1994, EPA issued its CSO Policy as "a

comprehensive national strategy to ensure that municipalities, permitting authorities, water

quality standards authorities and the public engage in a comprehensive and coordinated planning

effort to achieve cost effective CSO controls that ultimately meet appropriate health and

environmental objectives."  59 Fed. Reg. 18,688 (April 19, 1994).  The CSO Policy is intended

to provide guidance to communities that have combined sewer systems, as well as to state

NPDES and water quality standards authorities on the "planning, selection, and implementation

of CSO controls that meet the requirements of the CWA."  *Id*.  The CWA does not categorically

prohibit all CSOs.  Instead, the CSO Policy recognizes that CSOs are site specific in nature and

therefore provides the necessary flexibility to tailor controls to local situations.  *Id*.[5]

    On December 21, 2000, Congress added a provision to the CWA that explicitly endorses

EPA's CSO Policy in permits, orders, and judicial consent decrees.  That provision is known as

the "Wet Weather Water Quality Act of 2000," Pub. L. No. 106-554, § 112, (2000), and is found

at Section 402(q)(1) of the CWA, 33 U.S.C. § 1342(q)(1).  The Wet Weather Water Quality Act

provides that:

> Each permit, order, or decree issued pursuant to [the CWA] . . . for a
> discharge from a municipal combined storm and sanitary sewer shall conform to
> the Combined Sewer Overflow Control Policy ["CSO Policy"] signed by the
> Administrator on April 11, 1994 . . . .

---

[5] The CWA does, however, prohibit all dry weather CSOs.  *See* 59 Fed. Reg. 18,689.  Because all dry
weather CSOs are prohibited, the CSO Policy does not apply to dry weather CSOs.  *Id*.

33 U.S.C. § 1342(q)(1).  The primary mechanism specified in the CSO Policy for implementing

these principles is the multi-step process of developing and implementing a "Long Term Control

Plan" ("LTCP") to determine the long-term remedial measures necessary for a community's

CSOs to come into compliance with the CWA "as soon as practicable."  *See,* 59 Fed. Reg. at

18,688, 18,691-94.

The CSO Policy also identifies Nine Minimum Controls ("NMCs") which are interim

technology-based controls that can reduce CSOs and their effects on the water quality of the

receiving waters, do not require significant engineering studies or major construction and can be

implemented in a relatively short period of two years or less.[6]  The NMCs include: (i) proper

operation and maintenance of the CSS; (ii) maximization of use of the CSS as a means of storage

of wastewater; (iii) review of pretreatment requirements; (iv) maximization of flow to the

treatment plant; (v) prohibition of CSOs during dry weather; (vi) control of solids and floatable

materials in CSOs; (vii) pollution prevention; (viii) public notification to ensure that the public

receives adequate notice of CSO occurrences and CSO impacts; and (ix) monitoring to

effectively characterize CSO impacts and the efficacy of CSO controls. CSO Policy, Section

II.B, 59 Fed. Reg. at 18691.

CWA Section 505, 33 U.S.C. § 1365, also expressly defines a role for citizens, who may

bring a civil action for certain enumerated violations, including alleged violations of effluent

standards or other limitations set forth in the CWA, after providing 60 days' notice to EPA, the

---

[6] USEPA, Combined Sewer Overflows: Guidance for Nine Minimum Controls, EPA Office of Water,
EPA 832-B-95-003 (May 1995) pp. 1-7. *See,* http://www.epa.gov/npdes/pubs/owm0030.pdf (last visited
October 22, 2015).

state (here, the District), and to the alleged violator. Citizens may seek injunctive relief and civil penalties, which are paid to the United States treasury.  CWA Section 505(b), 33 U.S.C. § 1365, also provides, however, that a citizen may not bring suit if the EPA or a state "has commenced and is diligently prosecuting a civil…action" about the same matters – but that the citizen may intervene as a matter of right in such a case. Section 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B). Thus, where the state or federal government diligently prosecutes a suit, the citizen intervenor plays a more modest and supplemental role.  *See, e.g.,* Alliance for the Great Lakes, et al., v. Metropolitan Water Reclamation District of Greater Chicago, 792 F.3d 821, 825 (7th Cir. 2015).

## II.    PROCEDURAL AND FACTUAL BACKGROUND.

**Judicial History:** In 2000, Earthjustice, one of the commenters here, after providing the requisite notice to EPA and to DC Water, sued DC Water on behalf of a number of client community and environmental groups[7] for alleged violations of the District's water quality standards and violation of effluent limitations and other conditions of DC Water's NPDES Permit, and a failure to properly operate and maintain the CSS. Rec. Doc. 1.  The litigation deadlines in the case were extended for settlement negotiations.  On December 2, 2002, the United States filed a similar suit alleging CWA violations, which ultimately was consolidated with the citizen suit.[8]  On June 25, 2003, the United States filed a Partial Consent Decree, agreed to and signed by Plaintiffs Earthjustice on behalf of its clients and the United States on

---

[7] Earthjustice's clients are the Anacostia Watershed Society, Kingman Park Civic Association, American Canoe Association, Friends of the Earth, Sierra Club, and Mary Stuart Bick-Ferguson.

[8] The federal complaint was filed under Civil Action No. 1:02CV02511, Rec. Doc. 1, as a related case, and consolidated with Earthjustice's suit on August 6, 2003.  Thereafter pursuant to court order all filings have been docketed under 1:00-CV-00183.  *See,* Rec. Doc. 49.

behalf of EPA, defendant DC Water, and statutory defendant District of Columbia,[9] which the Court entered on October 10, 2003 ("2003 Consent Decree" or "Partial Consent Decree").  Rec. Doc. 56.  The Partial Consent Decree required DC Water to undertake measures to come into compliance with each NMC and to rehabilitate certain pump stations. The Partial Consent Decree also required payment of a civil penalty of $250,000, expenditures of $1.7 million on GI projects in the District, and financing of a $300,000 "green roof" to be administered through the Chesapeake Bay Foundation.  *Id.*

Litigation ensued on the remaining claims and the Court set trial for July, 2005.  Rec. Doc. 64.  In April and September, 2004, the Parties narrowed the claims via stipulation.[10] Ultimately, the Parties agreed and the Court ordered that the issues to be tried would be limited to the schedule for the implementation of the CSO controls selected in the LTCP, which would include "the risks or threats posed to human health and the environment by discharges from WASA's combined sewer overflows, the time required for design and construction of the selected controls, and the financing of the LTCP selected controls."  Rec. Docs. 86, 88-2.

On December 16, 2004, Plaintiff United States filed the proposed 2005 Consent Decree, which resolved federal claims related to violations of the water-quality based CSO effluent limitations in its NPDES Permit and required defendant DC Water to implement its Long Term Control Plan (LTCP) pursuant to a schedule set forth in the Consent Decree, with all work to be

---

[9] CWA Section 309(e), 33 U.S.C. § 1319(e), required that the District be a party to the lawsuit.

[10]  In April, 2004, the Parties agreed that DC Water would not contest its liability for certain NPDES Permit violations and both Plaintiffs agreed not to pursue further civil penalty claims for CSO discharges under a 1997 predecessor NPDES permit.  Rec. Doc. 66.  In September, 2004, the Parties further stipulated that certain issues pertaining to whether the LTCP conformed to the water quality standards of the District, and whether the requirements of CWA Section 402(q) were met, would be addressed through EPA's permitting function and not in the litigation.  Rec. Docs. 86, 88-2.

completed by 2025. DC Water had developed the LTCP over several years with EPA's

participation and involvement and after extensive consultation with stakeholders and a public

comment period.[11] The 2005 Consent Decree required design and construction of underground

tunnels in each sewershed, comprised of:

- a system of storage tunnels with a capacity of 126 million gallons in the Anacostia sewershed, to be completed in two segments ending in 2018 and 2025;

- a 9.5 million gallon storage tunnel in the Rock Creek sewershed, to be completed in 2025; and

- a 58 million gallon storage tunnel in the Potomac sewershed to be completed in 2025.

The 2005 Consent Decree and the LTCP also required targeted separation in each sewershed for

CSOs with small volumes; consolidation or elimination of other CSOs; and construction of

pumps, interceptors and other structures where necessary. 2005 Consent Decree, Rec. Doc.

100, Section VI.A-C.

The 2005 Consent Decree further required certain upgrades to the excess flow treatment

train at Blue Plains AWT. *Id.,* Section VI.D. It required that DC Water would perform post-

construction monitoring to confirm that the anticipated CSO reductions had occurred. *See,* Rec.

Doc. 100, Section VIII. And, similar to the 2003 Partial Consent Decree, the agreement

contains provisions that are commonly found in similar federal civil CWA settlements,

including provisions for submission of plans to EPA for approval; stipulated penalties for non-

compliance; reporting provisions; and dispute resolution.[12]

---

[11] *See,* Rec. Doc. 100 (2005 Consent Decree), whereas clause pg. 3.

[12] *See,* 2005 Consent Decree, Sections X, XI, XII, XIV, respectively.

The United States received no adverse comments on the agreement and moved to enter the proposed consent decree,[13] which the Court approved and entered on March 25, 2005.  *See,* Rec. Doc. 100.

Plaintiff Earthjustice did not join the LTCP Consent Decree.  It did not object to its entry, however, but rather submitted a response, Rec. Doc. 99, which provided in pertinent part:

> We support entry of the above-referenced consent decree forthwith.  We do not necessarily agree with every provision of the decree, and would prefer a faster implementation schedule… The priority at this stage, however, is to get the implementation process started to address this major environmental problem. Overall, the proposed consent decree is a major step forward, and we therefore support its entry by the Court at the earliest possible date.

Rec. Doc. 98-1.

**Permit History.**

EPA's NPDES Permits also incorporated the CSO controls that DC Water selected in its LTCP and addressed certain water quality standards issues.  From 2004 through 2008, that NPDES Permit was modified and contested by permittee DC Water and citizen groups on various grounds.  It expired on February 28, 2008.[14]

On September 30, 2010, EPA reissued DC Water's NPDES Permit, which at the time of this writing has expired but is administratively extended ("2010 NPDES Permit).[15]  It contains a Section pertaining to the CSS similar to the predecessor NPDES Permit and specifies requirements for both the NMCs and the LTCP, including tunnels of specific capacities.[16]  The

---

[13] Rec. Doc. 98.

[14]  Ex. 6 (August 31, 2010 Final Fact Sheet for NPDES Permit Reissuance, DC Water Wastewater Treatment Plant at Blue Plains), Section 6, pp. 2-5.

[15] NPDES Permits are issued for a five-year period, and, if applications are timely filed, can be administratively extended.  40 C.F.R. § 122.6(a).

[16] Ex. 7 (2010 NPDES Permit), Part III, pp. 31- 50.

2010 NPDES Permit also updated effluent limitations for the Blue Plains AWP to incorporate requirements imposed by regulations to improve the water quality in the Chesapeake Bay. DC Water received more stringent effluent limits for Total Nitrogen, but at the same time the CSO Controls would convey greater flows to the Blue Plains ATP as the LTCP was implemented. Thus DC Water proposed and EPA accepted a plan, dubbed the "TN/Wet Weather Plan," pursuant to which DC Water would upgrade its existing nitrogen removal system pursuant to a schedule and attain compliance with the revised TN limits on or before January 1, 2015, while providing for greater flows from the CSS.[17]  The 2010 NPDES Permit incorporates the TN/Wet Weather Plan and contains a revised flow regime under which DC Water maintains a stable maximum flow through the full treatment train, including the nitrogen removing facilities, to discharge through Outfall 002.  DC Water would construct a 31 million gallon tunnel from Poplar Point to Blue Plains, to increase storage of wastewater, and install more effective enhanced clarification facilities to treat all flows.  During wet weather, the 2010 NPDES Permit allows DC Water to discharge partially treated flows through Outfall 001.[18]

Finally, another EPA permitting function is relevant to comments addressed in this Motion.  EPA issues the stormwater permit for the District, pursuant to its Municipal Separate Storm Sewer System regulations, known as MS4 regulations. *See, e.g.,* 40 C.F.R. § 122.26 *et seq.*  On October 7, 2011, EPA issued the most recent MS4 Permit for the District, which contains requirements to install, operate and maintain Best Management Practices (BMPs) in the

---

[17] Ex. 7 (2010 NPDES Permit), Part IV Special Conditions D. Total Nitrogen Compliance Schedule, pg. 55.

[18]  Ex 6 (2010 Fact Sheet), pp. 12-17.

portions of the District with a separate – as opposed to combined – sewer system.[19] BMPs are used to control stormwater.

**Status of Implementation of the 2005 Consent Decree and the LTCP.**  There have been no disputes between the United States and DC Water requiring judicial intervention since entry of the 2005 Consent Decree. Nor, except for a few months of litigation over attorneys fees, has Earthjustice raised any issues in its case.

DC Water completed work under the 2003 Consent Decree more than two years ago and the consent decree is eligible for termination.[20]  Pursuant to the 2003 Consent Decree, DC Water has replaced and upgraded pump stations and control structures, separated a number of areas in the Rock Creek and Potomac sewersheds, cleaned out massive siphons and pipes under the Anacostia River and elsewhere, and provided some public notification.[21]

DC Water has dug the 31 million gallon Blue Plains tunnel from Poplar Point to Blue Plains ATP and is on track to complete the installation of the enhanced clarification facilities by the 2018 deadline.  Ex. 4 (DC Water October 2015 Quarterly Report), pg. 5.  DC Water also has designed and is constructing the Anacostia system of tunnels and pump stations.  DC Water currently is constructing the Anacostia River Tunnel and the Poplar Point Pump Station, is performing engineering work on the Northeast Boundary Tunnel, and has completed other required work on the west side of the Anacostia River at CSOs 019 and a diversion sewer for

---

[19] *See,* Ex.13; On-line information is at  http://www3.epa.gov/reg3wapd/npdes/dcpermits.htm.

[20]  *See,* Rec. Doc. 55 (2003 Consent Decree), Section XXV (Termination), Paragraph 89(a); Ex. 9 (2003 Consent Decree quarterly status report).

[21] *Id.*

CSOs 015 through 017, as well as work on the east side of the Anacostia River for the diversion sewer at CSO 007.[22]

## III.    THE PROPOSED FIRST AMENDMENT.

The proposed First Amendment modifies the selected CSO controls to incorporate GI in the Rock Creek and Potomac sewersheds.  It also contains certain conforming changes to reflect the Total Nitrogen (TN)/Wet Weather Plan, approved in the 2010 NPDES Permit and currently being implemented at Blue Plains.

**Rock Creek.**  The Amendment provides for replacement of a 9.5 million gallon tunnel with GI sufficient to control the volume of a 1.2" rainfall on 365 impervious acres and some targeted sewer separation.  The GI projects will be installed on both public and private land.  Ex. 5 (May 2015 Modification) pg. 3-1.  Projects will be completed in five phases or "Projects," each of which is subject to enforceable deadlines.  Appendix F, II.D.1-5.

**Potomac River.**    The Parties agreed to a hybrid approach of both Gray and Green Infrastructure in the Potomac sewershed.  The Amendment provides for a 30 million gallon tunnel, reduced from the 58 million gallons required by the 2005 Consent Decree, to control CSO discharges from CSOs 020 through 024, which serve the main interceptors draining Rock Creek and the large downtown areas in the Potomac sewershed. Ex. 5 (May 15, 2015 Modification), Section 3.2.1. That tunnel will feed by gravity from CSO 024 to the Blue Plains Tunnel in the Anacostia Tunnel System, eliminating a pumping station.  First Amendment, Section VI. B. Paragraph 22.  DC Water will separate the 20-acre drainage area for CSOs 025 and 026.  First Amendment, Section VI. B. Paragraph 23.

---

[22] *See,* Ex. 5 (May 2015 Long Term Control Plan Modification for Green Infrastructure ("May 2015 Modification"), pp. 1-9 to 1-11; Ex. 4 (October 2015 Quarterly Report).

To control flows into CSOs 027, 028 and 029, the proposed Amendment requires installation of GI capable of controlling a volume of water equal to 1.2" rainfall over 133 impervious acres.  DC Water will modify and improve diversion structures in that area, and will implement the GI in the Potomac sewershed in three phases, each of which is subject to specific deadlines.  Appendix F, II.C.1-3.

**Schedule.**  The First Amendment includes a 5-year extension to complete the foregoing work in the Rock Creek and Potomac River sewershed, so that all work will be completed in 2030 instead of 2025.[23]

**Other provisions.**   Installation of GI in such an urban environment on this large scale is new and presents both technical and institutional challenges.  DC Water accordingly commits to coordinate with the District, to timely submit permit and other applications, and to assume certain inspection and maintenance requirements.  The District in turn commits to appointment of an executive-level official from the District to facilitate inter-agency coordination, to process permits and approvals promptly, and to review certain existing policies for potential impediments to GI.  Appendix F, Section II.F and Section III.  Moreover, DC Water, after completing its first Project and performing post-construction monitoring for that Project in each sewershed, is required to make a determination, which is subject to EPA review and approval,  as to whether use of GI is practicable, and must consider enumerated factors in that determination. Appendix F, II.C. 5 and II.D.7.

The Anacostia tunnel system and other selected CSO controls generally are not modified by the First Amendment, except for the added capacity of the 31 million gallon Blue Plains

---

[23]  First Amendment, Section VI. B. Paragraph 22 (Potomac Storage Tunnel); Appendix F, II.C.1-3 (Potomac GI); Appendix F, II.D.1-5 (Rock Creek GI).

tunnel and other work described above.  And, the procedural and other provisions of the 2005 Consent Decree generally remain in place.

**Justification.**   The GI required by the proposed First Amendment is predicted by computer modeling to provide CSO reductions "equivalent to" the CSO reductions predicted by the selected CSO controls in the 2005 Consent Decree.  *See,* Amendment, pg. 5 and Paragraph 11.

The move to GI to replace the Gray Infrastructure in the 2005 Consent Decree is justified by a number of factors.  GI is touted as having a "triple bottom line" because it has environmental, social and economic benefits.

- Environmentally, GI retains water from small wet weather events which in turn reduces CSO discharges.  It can also improve air quality, reduce urban heat island effects, and provide some carbon sequestration.

- Socially, GI has beneficial aesthetic effects, improving the overall welfare of the community; it also may have positive health impacts by improving air quality and its construction is potentially less disruptive than Gray Infrastructure. The GI may provide for more recreational opportunities in local neighborhoods.

- Economically, construction, operation and maintenance of GI provide local employment and jobs for relatively unskilled workers and keeps the funds used to pay for CSO reduction in the local community.  In contrast, construction of Gray Infrastructure typically is performed by specialized contractors or construction firms that use highly skilled labor and may not be headquartered in the CSO community. The improved aesthetics also may increase property values. *See,* Ex. 5 (May 2015 Modification), pp. 2-2 to 2-4.

The Parties agreed that a five-year extension to implement the shift to GI is warranted here because there are a host of institutional and technical uncertainties.  Challenges include not merely technical issues as to which kind of GI project to use, but also planning and management issues including coordination with local residents and District agencies, siting, permitting, and so forth.  In the Potomac sewershed, the Potomac River waterfront has developed since 2004 so that open space is no longer available; therefore locating a place to construct facilities may be a

15

challenge and limited space may complicate planning and implementing construction. Moreover, the Potomac CSOs are located on property owned by the National Park Service, and DC Water will need to complete an Environmental Impact Statement (EIS) in order to proceed with the Potomac River tunnel. Finally, one lesson learned from the Anacostia tunnel projects is that additional lead time to relocate utilities is necessary. *See,* Ex. 5 (May 2015 Modification), pp. 3-1 and 3-2 (Rock Creek) and pp. 3-8 and 3-9 (Potomac); Exhibit 1 (Response to Comments), Topic 7.2.

The impact of the 5-year extension on water quality is ameliorated to some extent because as each small scale GI project or phase of GI projects is completed and begins to operate, it begins to retain and control stormwater.  In contrast, tunnels have no beneficial CSO control until they are completed and placed into operation, at which point the full storage capacity is available.  Thus, under the First Amendment, the beneficial environmental effects of GI will begin to occur sooner relative to the schedule tunnels, even if the full effects are realized five years later.  These incremental impacts do not net out the additional CSO volumes resulting from the five year extension, but do mitigate it.[24]

## IV.    OVERVIEW OF COMMENTS.

The United States lodged the proposed First Amendment with the Court and noticed it for public comment pursuant to Department of Justice regulations.[25]  The United States granted a

---

[24] DC Water has prepared visual diagrams and calculated these ameliorative effects in the May 2015 Modification, at pp. 3-4, Figure 3-3 (Rock Creek) and pg. 3-15, Figures 3-5 and 3-6 (Potomac River).

[25] This is the second round of public comment on the proposed changes to the selected CSO controls.  As required by Paragraph 101 of the 2005 Consent Decree, DC Water presented its proposed LTCP Modification to the public in January 2014 and engaged in extensive public outreach.  DC Water made changes to its proposal following input from the public.  Its outreach and the hundreds of comments received are summarized in the May 2015 Modification and will not be further addressed here.  *See,* Ex. 5 (May 2015 Modification), Section 5.

request to extend the comment period 30 days for a total of 60 days. The Department of Justice received 70 comments, comprised of (1) comments from nine associations or environmental groups; (2) 31 comments from individuals that tracked a form or template expressing three identical concerns ("template comments"); and (3) 30 comments from individuals which were generally short emails.[26] The United States addresses the comments in detail in Ex. 1 (Response to Comments). A full copy of each comment is provided to the Court, *see,* Ex.3, and a table gives each comment a unique number and identifies where the relevant response(s) to it are found in the Response to Comments. *See,* Ex.2.

Seven commenters (individuals and organizations) clearly expressed support for entry of the First Amendment.[27] Five of the environmental organizations expressed strong support for GI and stopped short of asking the Court to reject the Amendment or to return to the original CSO controls; rather, they had specific criticisms or concerns or suggested changes.[28] The 31 template comments echoed the same concerns as the environmental groups and similarly did not request that the Court reject the Amendment.[29] Only one individual clearly compared the options of tunnels versus GI and urged that the Court reject the GI.[30] A number of individual commenters expressed concern about the delay,[31] and for approximately 19 or 20 of the

---

[26] No comments were received regarding the Total Nitrogen Plan components of the First Amendment. Those revisions in essence conform the LTCP and 2005 Consent Decree to DC Water's 2010 NPDES Permit (which already was subject to public comment) and therefore the TN Plan will not be further analyzed here.

[27] Comments Nos. 2, 3, 6, 9, 42, 47, and 67.

[28] Comments Nos. 1, 4, 5, 7, and 8.

[29] Comments Nos. 10- 41.

[30] Comment No. 63.

[31] Comments Nos. 54, 59, 60, 62, and 65.

individual comments it was not possible to discern what recommendation or request the commenters were making with respect to the proposed Amendment. Since many of the comments addressed similar concerns, they are best responded to on a topic-by-topic basis. The main criticisms are as follows:

**Concern about the Delay in CSO Reduction from the 5 year Extension**.

By far the largest concern arose from the 5 year extension.  Several commenters referred to the harmful effects of CSO discharges, the urgency created by human exposure to the contamination, and the impact on water quality in the region.  Many commenters found the justification for the 5-year extension to be unpersuasive, stating that DC Water knew or should have known that an EIS would be required, that sufficient data regarding the effectiveness of GI existed so that adaptive management need not require five more years, and that concerns about affordability were not warranted or could be addressed through a different rate scheme or additional programs to provide discounted services to low-income households. *See,* Ex. 1 (Response to Comments), Topic 7.

**Concerns About Perceived Deficiencies in the GI Plan in Appendix F.**  At the same time as commenters objected to the delay posed by the 5 year extension, they also objected to the alleged lack of detail and advanced planning in the GI program.  Some commenters complained that: (i)  DC Water had not performed a full analysis of the availability of public and private space; (ii) while Appendix F requires DC Water to submit a plan for a maintenance program within a year from entry of the Amendment, the agreement does not specify what the maintenance program has to contain or what standards govern it; (iii) the standards for the practicability determination were vague and unclear; and (iv) the Amendment should contain more provisions regarding contingencies (potentially including the specific contingent CSO

18

controls) in the event post-construction monitoring did not demonstrate that the GI had attained the anticipated CSO reductions. *Id.,* Topic 6.

       **Comments seeking future public participation.**   A number of commenters requested future public participation and expressed an interest or willingness to engage in future discussions regarding the GI program.  Some criticized the Amendment on grounds that it did not in their view sufficiently provide for public input at future decision points. *Id.,* Topic 6.9.

       **Comments related to the Anacostia and the Impact on Incentives in the DC Stormwater Retention Credit.**   A number of comments stated that DC Water should be required to install additional GI in the Anacostia, as a Supplemental Environmental Project (SEP) or otherwise.   One commenter submitted detailed comments regarding potential market distortions or other impact on the DC regulations for the Stormwater Retention Credit. *Id.,* Topic 10.

        Comments also extended to other aspects of the Consent Decree that, at least in the view of the United States, were not squarely related to the change in the selected CSO controls, but rather reopened previous areas of compromise, or were only indirectly related to the primary purposes of the proposed First Amendment.  These topics included public notification issues; the District's plan to demolish structures related to the artesian wells in McMillan Park; comments that all foreseeable CSOs in an average annual year should be eliminated; and a few other points. *Id.,* Topic 11.

       Despite the large number of comments, some of which were very extensive, it is striking that many commenters either expressed support for the proposed Amendment or for Green Infrastructure itself.  The NRDC comments are illustrative:  the organization first complained that "we believe the current proposal has not fully addressed the practical difficulties that

implementation could present, and that additional planning analysis, checkpoint, and backstops

should be integrated into the plan," but then continued to state that

> NRDC supports the use of green infrastructure not only because it is a suite of
> proven and established technologies, but also because it provides many
> environmental, economic, and social benefits that underground tunnels do not.
> Vegetated practices that involve the use of trees and plants improve air quality by
> capturing pollution (including dust, ozone, and carbon monoxide) in their leaves
> and on their surfaces. Trees and plants also cool the air through
> evapotranspiration (the return of moisture to the air through evaporation from soil
> and transpiration by plants), thereby reducing building's energy use. Energy use
> is also diminished by the insulation provided by green roofs. Green roofs reflect
> sunlight and absorb less heat than conventional roofs, significantly reducing the
> urban heat island effect. Green spaces within urban environments create
> recreational opportunities and wildlife habitat, improve aesthetics, and increase
> property values…. Increased use of green infrastructure would help to provide
> these additional benefits to the residents and visitors of the District of Columbia.

Ex.3, Comment No. 7 (NRDC), pp. 3-4.

### V.     THE PROPOSED FIRST AMENDMENT SHOULD BE ENTERED BECAUSE IT IS FAIR, REASONABLE, CONSISTENT WITH THE CLEAN WATER ACT AND IN THE PUBLIC INTEREST.

### A.  STANDARD OF REVIEW.

The standard for judicial review of a consent decree is well-established in this Circuit:

> … The trial court in approving a settlement need not inquire into the precise legal
> rights of the parties nor reach and resolve the merits of the claims or controversy,
> but need only determine that the settlement is fair, adequate, reasonable and
> appropriate under the particular facts and that there has been valid consent by the
> concerned parties. [citations omitted.]...
>
> Furthermore, it is precisely the desire to avoid a protracted examination of
> the parties' legal rights which underlies consent decrees. Not only the parties, but
> the general public as well, benefit from the saving of time and money that results
> from the voluntary settlement of litigation. Thus, "[v]oluntary settlement of civil
> controversies is in high judicial favor." [citations omitted.]

Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

Accord, United States v. the District of Columbia, 933 F. Supp. 42, 46-47 (D.D.C 1996)(Hogan);

Environmental Defense v. Leavitt, 329 F. Supp. 2d 55, 70 (D.D.C. 2004); District of Columbia v.

Potomac Electric Power Co. et al., 826 F. Supp. 2d 227, 237 (D.D.C. 2011); United States v. Hyundai Motor Company et al.,  77 F. Supp. 3d 197 (D.D.C. 2015).  The function of the reviewing court is not to substitute its judgment for that of the parties to the decree, but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy.  United States v. District of Columbia, supra, 933 F. Supp. at 46-47.

Broad deference should be afforded to EPA's expertise in determining an appropriate settlement and to the voluntary agreement of the parties in proposing the settlement. *Id.* The policy of favoring consent decrees has particular force where a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement. Leavitt, supra, 329 F. Supp. 2d at 70, citing United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990).  Although citizens may intervene as of right under the CWA, "the CWA was not intended to enable citizens to commandeer the federal enforcement machinery," United States v. District of Columbia, supra, 933 F. Supp. at 46-47, citing United States v. City of Green Forest, 921 F.2d 1394, 1402 (8th Cir. 1990).  And, if citizen intervenors 'were allowed to block entry of a consent decree merely by objecting to its terms it would wreak havoc upon government enforcement actions."  *Id.,* citing United States v. Ketchikan Pulp Co., 430 F. Supp. 83, 85 (D. Ala. 1977).

Here, the Court is not reviewing the entire settlement *de novo,* but is reviewing a proposed Amendment which merely modifies certain provisions contained in the original agreement of the Parties.   The foregoing legal standard applies to consent decree amendments as well. *See,* Gorsuch, *supra*, 718 F.2d at 1121 (1979 modification of 1976 decree).

Other provisions in the 2005 Consent Decree and the proposed First Amendment indicate that for disputes related to modifications to the schedule or CSO controls, DC Water bears the

burden to show that the terms of the consent decree are no longer feasible and equitable, based on new information or a change in certain assumptions.[32]   As set forth in Section V.E below, that standard is intended for dispute resolution and does not apply to this voluntary agreement among the parties and the proposed Amendment readily satisfies the standard for entry of consent decrees and their amendments.

### B.  THE PROPOSED AMENDMENT IS PROCEDURALLY AND SUBSTANTIVELY FAIR.

Fairness incorporates both procedural and substantive components.  United States v. District of Columbia, supra, 933 F. Supp. at 48.  An assessment of procedural fairness involves looking "to the negotiating process and attempting to gauge its candor, openness, and bargaining balance."  Id.  The process leading to the proposed First Amendment was remarkably open and transparent.  The 2005 Consent Decree required preliminary consultation with EPA and a period for public comment prior to submitting to EPA a plan to modify the selected CSO controls.[33] DC Water exceeded the Consent Decree requirements:  it published its proposal in January, 2014 and engaged in some 14 meetings with the public.  See, Ex. 5 (May 2015 Modification), Section 5 (Public Comment). A period for public comment resulted in over 450 comments, which DC Water reviewed.  Ex. 5 (May 2015 Modification), Appendix K (Response to Comments).  The notice and comment required by Department of Justice regulations provided the public with an additional opportunity to comment on the proposal to substitute GI for Gray Infrastructure.  EPA's oversight and regulation of DC Water continues to be arms-length and appropriately

---

[32]  See, 2005 Consent Decree, Section VII, Paragraph 34; proposed First Amendment, Section VII, Paragraph 34.

[33] See, Rec. Doc. 100 (2005 Consent Decree), Paragraph 101.

adversarial.[34]  All parties are represented by sophisticated and experienced in-house and outside counsel.   Thus, the process leading to the proposed First Amendment was procedurally fair.

The proposed Amendment also is substantively fair.  "A consent decree that is substantively fair incorporates concepts of corrective justice and accountability:  a party should bear the cost of harm for which it is legally responsible."  United States v. District of Columbia, supra, 933 F. Supp. at 48.   The focus must be on the claims that have been filed and the agreement reached to resolve such claims.  Id., at 49-50.  Much of the heavy lifting in the evaluation of substantive fairness was performed in 2005, when no adverse comments were received, when Earthjustice indicated that the Court should expeditiously enter the Consent Decree, and when the Court in fact did so.  The amount of CSO reduction, the initial hard-fought and litigated schedule, compliance with the 1994 CSO Policy and District of Columbia water quality standards – all of those more thorny issues were resolved by entry of the Parties' agreement to the 2005 Consent Decree.

The CSO controls in the proposed First Amendment should achieve the same results as the original CSO controls in the original 2005 Consent Decree, based on computer modeling. See, First Amendment, pg. 5 ("Green/Gray controls projected to provide a degree of control equivalent to Gray controls in the LTCP"); Appendix E, Tables 3-1 through 3-4.  EPA and two Commenters have vetted the modeling.[35] The basic structure and procedures for future review

---

[34] See, McGuigan Declaration ¶ 7.   Indeed, the Court found probative in 1996 that the United States had filed claims arising from Blue Plains' compliance against the District three separate times since 1985, resulting in fines.  United States v. District of Columbia, supra, 933 F. Supp. at 49.  After the 1996 opinion, the United States sued DC Water once again over the CSO discharges at issue here.

[35] NRDC and Earthjustice requested and received data concerning DC Water's computer modeling during the public comment period, see, Ex. 10, and do not criticize the approach used to develop the projections.  See, Comments Nos. 4 (Earthjustice) pp. 3-4 and 7 (NRDC), pg. 5.  EPA also reviewed the computer modeling.  McGuigan Declaration ¶ 10.

and approvals, dispute resolution, stipulated penalties and reporting requirements, as well as many other terms, are not changed.  The focus of many comments is not the substantive fairness of the settlement but rather issues that might arise during its implementation that might preclude attaining a CSO reduction equivalent to the original Consent Decree.[36]   Those concerns do not warrant rejection of a carefully crafted settlement to which sophisticated parties agreed after protracted and arms-length negotiations.

### C.  THE PROPOSED AMENDMENT IS REASONABLE.

In examining the reasonableness of a consent decree the Court reviews three factors: (1) whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2) whether it will sufficiently compensate the public for the costs of the remedial measures, and (3) whether it reflects the relative strength or weakness of the government's case against the environmental offender.  United States v. District of Columbia, supra, 933 F. Supp. at 50 (citing United States v. Cannons Eng'g Corp., supra, 899 F.2d at 89-90.

The second prong is not relevant here.  DC Water and the District ratepayers will pay for the work required to implement the CSO controls and other measures called for under the settlement and therefore, unlike the Superfund case at issue in Cannons, the claim is not for reimbursement of clean-up costs or the costs of injunctive relief.

The Amendment is technically adequate.  Installation of GI on such a large scale in an urban setting such as Georgetown and upper Northeast presents challenges.  The Parties therefore negotiated an Amendment that requires that technical and institutional impediments be identified and addressed. To that end, the Amendment contains enforceable and well-thought out provisions that will ensure that the GI installation is performed appropriately and, if it is not, that

---

[36] See, e.g., Ex. 1 (Responsiveness Summary), Section 6.0 (Perceived Deficiencies in the DC Water GI Plan) and sub-topics listed thereunder.

deficiencies will be detected and corrected, or other alternatives (including reverting back to the

tunnels) sought. The Amendment does not require that all the details and planning occur prior to

entry, however, but rather – in a logical and fairly standard sequencing of events for these kinds

of settlements – requires that after Court approval DC Water will submit more detailed plans in

an orderly fashion for EPA to review and approve pursuant to the same procedures that have

been used since entry of the 2005 Consent Decree (and, indeed, since entry of the 2003 Consent

Decree to which Earthjustice is a party).[37] DC Water commits to coordinate with the District in

its planning and to perform a number of key tasks, Appendix F, II.F. Importantly, the District

commits to support GI in a number of specific ways, and to review and address regulatory,

policy and other agency impediments to GI implementation in the District. *Id.,* Section III. The

District and DC Water agree to further coordinate to align capital projects and expenditures to

cost-effectively and efficiently implement GI, *id.,* Section IV. If GI is ultimately deemed not

practicable, the Parties agree to return to the tunnels and Gray Infrastructure in the 2005 Consent

Decree. *Id.,* Section II.C.7 and D.9. The Parties agreed to add an additional five years to certain

of the deadlines in the Rock Creek and Potomac sewersheds to allow adequate time for

systematic planning and implementation of CSO controls that differ significantly from the Gray

Infrastructure CSO controls contemplated in the 2005 Consent Decree. *Id.,* schedules in Section

II.C and D. For all of these reasons, the proposed Amendment is technically adequate. *See,*

McGuigan Declaration, ¶ 8.

Finally, the agreement reflects the relative strengths and weaknesses of the United States'

case and does not alter the balance that was achieved in the initial agreement. The Parties

---

[37] *See,* McGuigan Declaration, ¶ 13 (describing the review and approval process); proposed Amendment, Section X.

already agreed to a civil penalty amount, paid pursuant to the 2003 Consent Decree, and neither the 2005 Consent Decree nor this Amendment require any additional penalty payments. The Amendment affords DC Water discretion and flexibility in selecting and designing its GI projects, but at the same time DC Water is required to submit its plans to EPA for review and approval,[38] to file reports on a quarterly and annual basis,[39] and to provide reports of the CSO results on a project-by-project basis as post-construction monitoring is completed.[40] Provisions regarding stipulated penalties and dispute resolution remain in effect.[41] The standard for termination of the Consent Decree remains the same.[42] For the foregoing reasons, the proposed Amendment is reasonable.

### D. THE PROPOSED AMENDMENT IS IN THE PUBLIC INTEREST.

The proposed Amendment requires CSO reduction that is equivalent to the reduction the Parties agreed to in the original 2005 Consent Decree.[43] The public interest inquiry is flexible and the court's function is not to determine whether the array of rights and liabilities will *best* serve society, but only to confirm that the resulting settlement is "within the *reaches* of the public interest." [emphasis in original]. United States v. Microsoft, 56 F.3d 1448, 1460 (D.C. Cir. 1995). Where the settlement advances the purpose of the environmental statute, it is in the public interest. *See, e.g.,* United States v. District of Columbia, *supra,* 933 F. Supp. at 52

---

[38] First Amendment, Section X.

[39] First Amendment, Section XI.

[40] First Amendment, Appendix F, Section II.A.8 and B.

[41] First Amendment, Sections XII and XIV.

[42] First Amendment, Section XXVI.

[43] *See,* First Amendment, pg. 5 ("Green/Gray controls projected to provide a degree of control equivalent to Gray controls in the LTCP"); Appendix E, Tables 3-1 through 3-4.

(terms of Agreement contribute to the restoration and maintenance of the … integrity of the nation's water); Leavitt, 329 F. Supp. 2d at 70 (proposed consent decree will insure that EPA moves forward in meeting CAA's requirements and coincides with congressionally-expressed public interest in reducing haze). This decree will achieve significant CSO reduction and easily satisfies that standard. Moreover, as noted in Section III, *supra*, GI has the potential to provide social and economic benefits in addition to those environmental benefits associated with CSO reductions, further advancing the public interest.

### E.  THE STANDARD IN SECTION VII DOES NOT APPLY HERE.

To resolve the litigation over the schedule, the Parties negotiated a "reopener" in which DC Water agreed that the schedule and the CSO controls in the 2005 Consent Decree were feasible and equitable, but that they could be modified if significant new information or a change in assumptions or projections rendered the existing agreement no longer feasible or equitable. ("Section VII standard").[44]  Under the dispute resolution procedures of the 2005 Consent Decree and the proposed Amendment, DC Water bears the burden of demonstrating that the requested modification should be approved under the foregoing standard.[45]  Although the Parties did not directly reference Fed. R. Civ. P. 60(b)(5), the standard is derived from that rule.[46]

That standard does not apply here.  First, the 2005 Consent Decree mandated that DC Water compile data regarding GI and address whether the data would allow it to reduce the

---

[44]  2005 Consent Decree, Section VII, Paragraph 34.  The proposed Amendment does not change that language, *see,* Amendment, Section VII, Paragraph 34.

[45]  2005 Consent Decree, Section XIV, Paragraph 77.  The same terms are contained in the proposed Amendment, Section XIV, Paragraph 79.

[46] Fed. R. Civ. P. 60(b)(5) provides that a court may relieve a party or its legal representative from a final judgment, order, or proceeding where, among other things, "applying it prospectively is no longer equitable."  Cases under that rule therefore can be instructive in interpreting the Section VII standard.

capacity of the tunnels in Rock Creek and the Potomac sewersheds.[47]  Thus, DC Water in the proposed Amendment is not seeking relief from a prior judgment, *cf.,*  Rufo v. Inmates of the Suffolk County Jail, et al., 502 U.S. 367 (1992); Horne v. Flores, 557 U.S. 433 (2009); LaShawn A. v. Fenty, 701 F. Supp. 2d 84, *aff'd,*  412 Fed. Appx. 315 (D.C. Cir. 2011), but rather is merely implementing the negotiated requirements of the original injunctive relief.  The Parties elected to use GI to reduce (or eliminate) the tunnels, when the time for the design of the tunnels arrived, as Section IX of the 2005 Consent Decree contemplated and required. Thus, the agreed-upon First Amendment does not implicate the standards in Section VII.

Second, the Section VII standard is best suited to dispute resolution.  That is why Section VII is expressly referenced in the dispute resolution procedures in the 2005 Consent Decree.  It is not, however, expressly incorporated by reference into the modification provisions in Section XXII of the 2005 Consent Decree, which provides that "[i]f all the Parties agree to a material modification in writing, they may apply to the Court for approval thereof."[48] Nothing in that provision indicates that the parties relinquish their inherent ability to negotiate consensual changes to the consent decree, which should be governed by the usual standard for entry of consent decrees set forth in Gorsuch and the other cases cited in Section V.A above.   Notably, if the Parties fail to reach agreement, the Section VII standards clearly apply:  the same paragraph states that  "[i]f the Parties do not reach agreement on such material modifications, the request for modification shall be subject to the dispute resolution procedures of this Decree"  -- which procedures expressly incorporate the Section VII standard.

---

[47] *See,* 2005 Consent Decree, Section IX (Low Impact Development Retrofit), Paragraph 46.

[48] 2005 Consent Decree, Section XXII, Paragraph 100; First Amendment, Section XII, Paragraph 102.

It is debatable as to whether the Section VII standard is met here, but the Court need not decide that in order to enter this Amendment. The United States proposes the First Amendment because it is fair, reasonable, and in the public interest. The Commenters, far from contesting whether the Amendment satisfies any legal standard for entry, instead broadly support GI and, in many instances, strongly support the proposed First Amendment as well.

## VI.    NOTHING IN THE CITIZENS' COMMENTS WARRANTS REJECTION OF THE FIRST AMENDMENT.

The comments received on the proposed First Amendment do not alter the conclusion that the First Amendment satisfies the legal standard for entry of judicial consent decrees. This Court, and many Courts of Appeal, have found that broad deference should be afforded to EPA's expertise in determining an appropriate settlement and to the voluntary agreement of the parties in proposing the settlement. *See, e.g.,* United States v. District of Columbia, supra, 933 F. Supp. at 47; *accord,* Gorsuch, supra, 718 F. 2d at 1128-1129 (rejecting argument that approval of settlement to which EPA voluntarily consented improperly limited its discretion); United States v. Cannons Eng'g Corp., supra, 899 F.2d at 84; United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1436 (6th Cir. 1991) (presumption in favor of voluntary settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field). Given the deference to voluntary settlements and in particular to those negotiated by the EPA in an area of its expertise, comments – no matter how numerous – should not be permitted to bar entry of an otherwise acceptable settlement.

That is especially true here, where many of the commenters express support for GI, where some expressly urge the Court to enter the Amendment, and where virtually none request that the Court reject the settlement. Instead, the commenters request redrafting of certain terms

of the Amendment or that the public play a greater role in its implementation.  But, "the right to

have its objections heard does not, of course, give the intervenor the right to block any settlement

to which it objects."    United States v. District of Columbia, supra, 933 F. Supp. at 48.  Caselaw

describing the limited role of citizen intervenors is instructive, [49]  even though Earthjustice is a

party to a consolidated suit and not an intervenor, and the other commenters have not intervened

in this case.

A detailed responsiveness summary is attached, which summarizes the comments in

greater detail on a topic by topic basis.  EPA and the Department of Justice reviewed, discussed

and carefully considered each of the comments.  Only a few points will be addressed in this

Memorandum, however:  (1) comments objecting to the five year extension of certain deadlines;

(2) comments or objections regarding perceived deficiencies in the proposed Amendment; and

(3) requests for greater citizen input and participation.

### A.  THE FIVE-YEAR EXTENSION IS JUSTIFIED AND DOES NOT BAR ENTRY OF THE CONSENT DECREE.

A common theme among the environmental groups and individual commenters was that

the five year extension is an untenable delay, and that DC Water's justifications for the extension

are not sufficient. It is clear that the schedule in this matter has been contentious; in fact, the

United States, Earthjustice, and DC Water litigated that issue for several years and it was one of

---

[49] A citizen is able to assert its own claim only if the federal government is not diligently prosecuting its claim.  See, e.g., CWA Section 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B). The Seventh Circuit recently considered the role of citizen-intervenors who objected to an initial federal CWA Consent Decree with a municipality on grounds that the results would "accomplish too little and take too long."  It concluded that, although citizen intervenors would have certain rights, "[t]hat is a more modest role than a full-fledged independent litigator would have, but [CWA] § 1365(b)(1)(B) tells us that a private party is not supposed to be a full-fledged independent litigator, if the state or federal government diligently prosecutes a suit," citing with approval the Supreme Court's finding that private intervenors are supposed to supplement rather than to supplant public litigation.  United States and Alliance for the Great Lakes, et al., v. Metropolitan Water Reclamation District of Greater Chicago, 792 F.3d 821, 825 (7th Circuit 2015).

the last issues left to be tried.  *See,* Rec. Docs. 86, 88-2 (stipulation).  The five-year extension

here was achieved after a period of arms-length negotiations between EPA and DC Water and

input from public comment, primarily because of the complexities of implementing GI in the

District, but also taking into account logistical issues arising from development of the Potomac

waterfront, experience in the Anacostia about lead time necessary to move utilities, and an NPS

requirement to perform an EIS. *See,* McGuigan Declaration, ¶ 15; Ex. 1 (Response to

Comments), Topic 7.

 To debunk DC Water's reasons for the extra time, however, commenters go so far as to

accuse it of misrepresentation, asserting in essence that it knew or should have known that the

US National Park Service would require DC Water to perform an EIS, for example, which could

add up to three years to the deadlines for the Potomac Tunnel, but providing no evidence for that

assertion.[50]  The United States agreed that DC Water would be permitted to implement the GI in

sequential Projects so that the incremental benefits can be enjoyed expeditiously but lessons

learned also can be applied to later projects.  It also gave weight to the other justifications

provided by DC Water.  That decision is well within EPA's technical and regulatory expertise

and it should be allowed discretion to make that concession to DC Water as part of the give and

take of the negotiation process.

---

[50] *See,* Comment 4 (Earthjustice), pg. 7, fn 16, and Comment 7 (NRDC), pg. 10 ("it seems highly unlikely that DC Water did not anticipate needing an EIS").  These comments ignore that not all environmentally sensitive projects require an EIS.  *See,* Ex. 1 (Response to Comments), Topic 7.2.

**B. THE TERMS OF THE AMENDMENT ARE CLEAR AND ENFORCEABLE AND THE PARTIES SHOULD BE PERMITTED TO LEAVE DETAILS TO PLANS TO BE SUBMITTED AFTER ENTRY OF THE PROPOSED AMENDMENT.**

A number of commenters pointed to alleged inadequacies in the First Amendment but none of those comments should bar entry and approval of the Amendment.   As summarized in Section IV above, perceived deficiencies include:

- the lack of detail or planning contained in the First Amendment itself, which commenters complain creates uncertainty (Topic 6.1), specifically including an analysis of public versus private land (Topic 6.2);

- a need for greater specificity for proper maintenance of GI projects, including requirements that future contracts contain certain provisions (Topic 6.4);

- contentions that the standards for EPA approval and disapproval are not sufficiently spelled out, for GI selection, for the determination of practicability, and other standards (Topic 6.5 and 6.6); and

- an alleged lack of detail concerning the additional controls that will be required if the expected CSO reductions are not attained (Topic 6.8).

Significantly, the Seventh Circuit rejected arguments analogous to those raised by the commenters here with respect to the proposed Amendment.  United States, et al. v. Metropolitan Water Reclamation District of Greater Chicago, supra, 792 F.3d at 827-828. There, the citizens complained that (1) some of the municipality's commitments were "worthless" or incomplete because the decree did not spell out details of monitoring;  and (2) the decree also did not specify what would be done if problems remained in 2029, when the decree ended.  The Court concluded that, given the size of the municipality involved (Chicago), "it's just not practical to try to cover all details in one document.  The EPA anticipates working out details as time passes… and if the

[municipality] does not cooperate the court can afford supplemental relief."   Second, as for what happens in 2029, the Court of Appeals held:

> [T]he next steps ought to depend on what's not then working well.  If the EPA (or a court) could be *sure* in 2014 what the exact nature of the problem (if any) would be in 2029, then it would be sensible to start planning and building the remedy today; but if either there won't be a serious problem in 2029, or the problem is something not now foreseen, then relying on a 2014 decree for the solution would be foolish.  Yogi Berra observed that it is hard to make predictions, especially about the future.  State and federal agencies are entitled to rely more on experience and less on predictions.

*Id.*

The level of detail in Appendix F of the proposed First Amendment is appropriate and sets forth a sequence that is both enforceable and efficient going forward.  Even where comments may suggest a laudable goal, if the settlement is otherwise fair and reasonable and addresses the public interest, courts reject the suggested change.  *See, e.g.,* United States v. Hyundai Motor Company, et al., 77 F. Supp. 3d 197, 201 (D.D.C. 2015) (in rejecting comment that a settlement should contain a Supplemental Environmental Project, court held that "[i]t would not benefit the public to jeopardize this agreement and potentially mire the government and Defendants in lengthy litigation with unpredictable results, while simultaneously delaying the implementation of corrective measures").   The government, through EPA, is entrusted to enforce the CWA on behalf of all of its citizens, United States v. the District of Columbia, 933 F. Supp. at 49 and note 8.  It is not the role of the court in reviewing the acceptability of a consent decree to impose its own judgments as to how it would prosecute and resolve a case – nor it is a citizen's right to have the case litigated in the manner it would choose. *Id.,* at 51.  Here, all of the comments, suggestions, and criticisms have been reviewed and are duly noted.  Many concerns are not well-founded:  provisions already exist in the First Amendment that address the issues and those are pointed out in the Response to Comments.  But many others are forward-looking comments that

are likely to be properly addressed in due course in the future implementation of the settlement, (with or without the comments) and therefore rejection of the proposed First Amendment based on perceived deficiencies in Appendix F is not warranted.

### C. THE DECREE SHOULD BE ENTERED UNCONDITIONALLY SO THAT EXPEDITIOUS IMPLEMENTATION CAN BEGIN.

Citizens have expressed a need for additional public input going forward, as the GI Plan is implemented, *see,* Ex. 1 (Response to Comments), Topic 6.9, as well as for additional checkpoints and assessments. *Id.,* Topic 6.7.  But there already has been extensive public input into and comment on the proposed move from tunnels to GI.[51]  There is no reason to think that this public outreach will not continue after entry of the proposed First Amendment: to the contrary, there will be a Plan for Public Outreach that will ensure robust public participation. *See,* Appendix F, Section I.C.[52]  Moreover, DC Water is required to post its quarterly and annual progress reports on its website.  First Amendment, Section XI, Paragraph 53.  DC Water has a practice of openly posting its technical analyses on its website, and pledges that it will continue to do so, ensuring that the commenters and other members of the public may review and, if they desire, informally comment on key deliverables submitted to EPA, including the GI Plan, the Public Outreach Plan, the Preservation and Maintenance Plans, DC Water's determination as to the practicability of GI in each sewershed, and many others.  Ray Declaration, ¶10.[53]

---

[51] *See,* U.S. Memo. in Support of Motion to Enter, Section V.B (Procedural Fairness), *supra,* and Ex. 5 (May 2015 Modification), Section 5.0.

[52] According to that provision, DC Water must submit a plan "to engage property owners in the Potomac and Rock Creek sewersheds and interested stakeholders to promote and facilitate installation of GI on private property and to ensure public input into the site selection process and concept design for the control measures that DC Water proposes to install as part of the GI Program Plan.  *See generally,* Ex. 1 (Response to Comments), Topic 6.9.

[53] One Court in this judicial district did impose two procedural conditions upon its entry of an environmental consent decree for a facility located on the Anacostia River, but that case did not involve

More importantly, any value of public comments must be weighed against the need for expeditious installation of the selected CSO controls.  "The need for an expeditious cleanup of an environmental violation can weigh in favor of approval of a proposed consent decree."  United States v. District of Columbia, 933 F. Supp. *supra*, at 49, citing United States v. Telluride, 849 F. Supp. 1400, 1405 (D. Colo. 1994); *accord,* Pepco, 826 F. Supp. 2d at 240.  Formal periods for public comment and formal response can lead to significant delays and should be used very selectively.  Given the past public input and the express obligation to continue public outreach, the balance now should be struck in favor of expeditious implementation of GI in each sewershed.

## VII.    SUMMARY.

The proposed First Amendment satisfies the standard in this Circuit and elsewhere for entry of judicial consent decrees:  it is fair, both procedurally and substantively; reasonable, because it is technically adequate and reflects the strengths and weaknesses of the Parties'

---

claims under the CWA and those conditions would not be appropriate here.  *See,* District of Columbia Department of the Environment ("DDOE") v. Potomac Electric Power Company ("Pepco"), 826 F. Supp. 2d 227, 240 (D.D.C. 2011).  There, DDOE and Pepco entered into a consent decree for performance of a site study under hazardous waste environmental statutes to select a clean-up of soil and groundwater contamination at Pepco's facility on the Anacostia.  Judge Howell rejected motions from three environmental organizations to intervene, given the standards in the applicable statutes, but allowed them to participate as *amici curiae.*  With respect to specific objections, Judge Howell entered the decree over complaints from the commenters that the proposed Statement of Work did not contain a deadline for completion of the RI/FS.  The court required, however, that the Parties submit a status report in 18 months and, if the RI/FS were not completed at that time, explain the basis and the proposed schedule for its completion.  Second, the Pepco court required that draft plans and other submissions to be made to DDOE under the consent decree there be subject to public comment, as well as timely publication of final plans – apparently pointing to a negotiated provision in the consent decree and oral assurances from counsel as to its application. *Id.,* at 240.

Neither of the Pepco procedural safeguards are necessary or appropriate here.   Intervention is not an issue here, and DC Water commits to continue to post its major required submittals to EPA on its website.  Ray Declaration, ¶ 10.

bargaining positions; and in the public interest because it advances the purposes of the Clean

Water Act.  The comments received indicate strong support for installation of GI in the District.

The Parties reviewed the comments and concluded that none of them warranted revision of the

Consent Decree.  Many suggestions will be taken under advisement, but given the limited scope

of the proposed First Amendment --which at bottom involves changes to a sub-set of selected

CSO controls and a 5-year extension to implement the new approach -- nothing warrants

rejection of the Parties' consensual and voluntary agreement.

## CONCLUSION

The United States respectfully requests that the Court sign and enter the proposed First

Amendment.


Respectfully Submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


s/Nancy Flickinger
NANCY FLICKINGER
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
601 D Street NW
Washington, D.C. 20004
(202) 514-5258 direct
(202) 514-0097 fax
Nancy.flickinger@usdoj.gov

36

CHANNING D. PHILLIPS,
D.C. BAR #415793
United States Attorney for
the District of Columbia

DANIEL F. VAN HORN,
D.C. BAR #924092
Civil Chief

_____/s/_____
KEITH V. MORGAN,
D.C. BAR # 422665
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2537
Fax: (202) 252-2599
Email: keith.morgan@usdoj.gov

OF COUNSEL:

YVETTE ROUNDTREE
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency
EPA Region III
1650 Arch Street
Philadelphia, PA 19103-2029

## EXHIBIT LIST

Exhibit No. 1          Response to Comments

Exhibit No.  2         Table – Index and Summary of Comments

Exhibit No.  3         Public Comments

Exhibit No.  4         Long Term Control Plan Consent Decree Status Report: Quarter No. 3 – October 2015

Exhibit No.  5         DC Water, Long Term Control Plan Modification for Green Infrastructure (May 2015)

Exhibit No.  6         Fact Sheet - 2010 NPDES Permit (excerpts)

Exhibit No.  7         2010 NPDES Permit

Exhibit No.  8         Combined Sewer Overflows Guidance for Nine Minimum Controls

Exhibit No.  9         Partial Consent Decree Status Report: Quarter No. 2 – 2015

Exhibit No. 10         Emails with Earth Justice request for information

Exhibit No.  11        Technical Memorandum No. 3 (excerpts)

Exhibit No.  12        Technical Memorandum No. 7

Exhibit No.   13       District of Columbia MS4 Permit (excerpts)

Exhibit No. 14         2015 National Park Service NEPA Handbook

Exhibit No.  15        Declaration of David McGuigan

Exhibit No.  16        Declaration of Carlton M. Ray