```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    Anacostia Watershed Society,   ) Civil Action
     et al.,                        ) No. CA 00-183
4                                   )
                      Plaintiffs,   ) MOTIONS HEARING
5                                   )
     vs.                            ) Washington, DC
6                                   ) January 14, 2016
     District of Columbia Water     ) Time:  2:00 p.m.
7    and Sewer Authority, et al.,   )
                                    )
8                     Defendants.   )
9    _____

10                TRANSCRIPT OF MOTIONS HEARING
                        HELD BEFORE
11          THE HONORABLE JUDGE THOMAS F. HOGAN
                UNITED STATES DISTRICT JUDGE
12   _____

                     A P P E A R A N C E S
13

14   For the Plaintiffs:      David S. Baron
                              Jennifer C. Chavez
15                            EARTHJUSTICE
                              1625 Massachusetts Ave. NW
16                            Suite 702
                              Washington, DC  20036
17                            202-745-5203

18                            Nancy A. Flickinger
                              U.S. DEPARTMENT OF JUSTICE
19                            Environ Enforcement Sec/ENRD
                              Ben Franklin Station
20                            P.O. Box 7611
                              Washington, DC 20044
21                            (202) 514-5258

22   For the Defendants:      Dale G. Mullen
                              David Ellis Evans
23                            MCGUIRE WOODS LLP
                              901 East Cary Street
24                            One James Center
                              Richmond, VA 23219-4030
25                            (804) 775-4317
```

1   Proceedings reported by machine shorthand, transcript
    produced by computer-aided transcription.

2   _____

3   Court Reporter:          Janice E. Dickman, RMR, CRR
                             Official Court Reporter
4                            United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
5                            Washington, DC  20001
                             202-354-3267

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Civil action number 00-183,

2     Anacostia Watershed Society, et al. versus the District of

3     Columbia Water and Sewer Authority, et al.

4          David Baron and Jennifer Chavez for the plaintiffs,

5     Nancy Flickinger for the plaintiff United States.  Dale

6     Mullen and David Evans for the defendants.

7          THE COURT:  All right.  Good afternoon, Counsel.

8     Thank you for coming in.  I've got, before me today, in the

9     Anacostia Water Society, et al., the hearing on the motion

10    of First Amendment to the Consent Decree.  That has been

11    filed by the government and the federal government and the

12    District of Columbia Water Authority, as well.

13         The Court wished to have a hearing because of not

14    only the response to the motion by the plaintiffs in this,

15    but the public comment that was made and the somewhat very

16    substantial changes, apparently, to the original consent

17    decree by using different technology and proceedings and

18    extension of five years to complete the projects that have

19    been agreed to earlier to be done because of these changes.

20         So, I'll hear from the -- whoever wishes to

21    address the Court as to the reasons and rationale for these

22    changes and that the Court should accept.  My fundamental

23    question is -- I had more detailed ones, but my more

24    fundamental one, when I read through all the materials,

25    really is why are we doing this?  And the motion and

1    supporting documentation is replete with this should work,

2    this is anticipated to work, this has possibilities of

3    working.  But I'm concerned because the original plan,

4    reading through the materials, with the tunneling system

5    does work.

6              So I need to understand why this is necessary, why

7    it's being proposed in the public interest.  So with that,

8    whoever can address the Court.

9              MS. FLICKINGER:  Good morning, Your Honor.  I'm

10   Nancy Flickinger for the United States of America.

11             THE COURT:  Thank you.

12             MS. FLICKINGER:  We have moved to enter the

13   Consent Agreement, we believe it's in the public interest.

14   There's, obviously, a legal standard:  Is it fair,

15   reasonable and in the public interest?  And we do believe

16   that it is.

17             We're prepared to go through and explain the

18   nature of the changes.  It's probably useful to go through

19   those with the Court.  And then we can talk more about the

20   reasons and the purpose for the modification.

21             This is what was envisioned for the 2003 Consent

22   Decree.  The combined sewer, as the Court may recall,

23   occupies two-thirds of the District of Columbia, basically

24   around this area.  One-third.  Two-thirds is not -- the

25   remaining two-thirds is not combined sewer.  The largest

1    volume comes from the Anacostia sewer shed, around there.

2    (Indicating.)  If there are absolutely no controls, it's 3.2

3    billion gallons per average annual year.  Two-thirds of that

4    comes from the Anacostia system.  And then this amendment

5    has to do with Rock Creek and the Potomac Sewer Shed, so

6    roughly in that area.

7             Rock Creek, for example, is 45 million gallons.

8    So this is 2.1 billion gallons in an average annual year,

9    and this is 45 million gallons.  So that gives you a sense

10   of the relative size of the two sewer sheds we're talking

11   about.

12            In 2005 the parties agreed to a long-term control

13   plan that was all gray infrastructure, which is the tunnels

14   and pump stations, kind of capital equipment.  And the

15   Anacostia gray infrastructure was to be put in two segments.

16   It would start at Poplar Point and go up to Kingman Island.

17   And that would be online in 2018.  That would be 49 million

18   gallons storage capacity.  And then a second segment would

19   be completed by 2025 and that would be 77 million gallons

20   capacity.  So the total in the Anacostia would be 126

21   million gallons.

22            The tunnel in the Potomac area along the

23   Georgetown waterfront here would be 58 million gallons.

24   It's a storage tunnel, so it doesn't convey the flow.  It's

25   just when there's excess flow, instead of going into the

1    river, it's held.  And as there's capacity in the pipes,

2    it's pumped out and put back into the pipes that go along

3    here, that aren't on the map.  And then in -- up around the

4    Piney Branch area in Rock Creek there's a 9.5-million-gallon

5    tunnel.  So that's what is in the existing infrastructure.

6              There's an interim step here which I won't talk

7    about very much.  It didn't get any comments.  It's already

8    been approved and it's in the NPDES permit, which also

9    tracks the long-term control plan.  And there are changes

10   that are just being made in a proposed first amendment to

11   conform the amendment to the permit.

12             But, one of the important things is that there's

13   additional capacity being added right along there, from Blue

14   Plains to Poplar Point.  So, here we are in the proposed

15   amendment --

16             THE COURT:  The permit, is that one that was

17   extended in 2010 that was never reauthorized?

18             MS. FLICKINGER:  It's in 2010.  And there's a very

19   common procedure, it's an administrative extension until the

20   next one is being reissued.  So EPA is working on that.  It

21   should be issued in the not too far future.

22             THE COURT:  Because didn't they allow a six-year

23   extension?

24             MS. FLICKINGER:  Yeah, it's a complicated one.

25   So, this is what's in the proposed amendment.  The only

1    changes in the Anacostia Sewer Shed, which remains gray

2    infrastructure tunnels, is that there's a lot more

3    additional capacity.  So you have additional capacity

4    starting at Blue Plains up to that Poplar Point of 31

5    million gallons.  And then this tunnel, the second segment,

6    up to Kingman Island, is also being expanded.  So this will

7    be 105 million gallons that will be online by 2018.

8         So under the 2005 Consent Decree it was 49 million

9    gallons.  Under the proposed amendment it will be roughly

10    twice that capacity.  And then by 2025 -- this is on

11    schedule, there's no five-year extension involved here --

12    this will be completed.  Mr. Evans may talk a little bit

13    later.  There's been some work that's not in the Consent

14    Decree to control flooding.

15         So, that part of the Consent Decree remains

16    unchanged and that work is going forward.  It's on schedule.

17    This tunnel has already been dug.  They're working on this

18    one, which is under construction.  And this one is in the,

19    kind of, engineering procurement stage up there.  So they're

20    making good progress on that part of the case.  (Indicating.)

21         The Anacostia was one of our main concerns and

22    first priorities, really, in negotiating the 2005 Consent

23    Decree.  And so that is being taken care of and the only

24    change there is that the capacity is significantly bigger.

25    157 million gallons here, 126 million gallons here.

1     (Indicating.)

2            Okay.  The parties propose to adopt green

3     infrastructure along the Potomac.  There's been a lot of

4     work to consider what to do along the Potomac riverfront.

5     And D.C. Water, after going back and forth with EPA, has

6     proposed a hybrid solution, so that the 58-million-gallon

7     storage tunnel will be changed to be -- reduced, and to be a

8     30-million-gallon storage conveyance tunnel.

9            So instead of having to hold it and then pump the

10    waste water out, it flows by gravity down into this new

11    tunnel, the Blue Plains tunnel.  So this is a gravity flow

12    through there, and that will be 30 million gallons.  That

13    receives the largest flow from Piney/Rock Creek, from the

14    downtown business area.  And there's been a lot of computer

15    modeling and that seems to be the optimal solution there.

16           So that will reduce the CSO discharges from four

17    outfalls, running from the Kennedy Center up to Thompson's

18    Boathouse.  That will be treated as gray infrastructure.

19           Then there are two CSOs, outfalls, 25 outfall, 26,

20    that will just be removed from the combined sewer system by

21    separating the system.  So they will actually rebuild that

22    sewer system, so it will not be a combined sewer system

23    anymore, which is a good resolution.  And then green

24    infrastructure will treat four of the four remaining

25    outfalls along the Georgetown waterfront.  Up here, right in

1    that area will be treated by gray infrastructure.

2    (Indicating.)

3              And Rock Creek, after analysis and computer

4    modeling and so forth, it was determined that the 9.5-

5    million-gallon tunnel could be eliminated and it could be

6    treated with green infrastructure.

7              THE COURT:  Let me -- I read through that.  And

8    I'm a little concerned in a couple of areas.  And what is

9    the government's -- I guess you come from the -- represent

10   the interests of the EPA and the federal government in this

11   matter.  Again, your rationale for accepting this change

12   with the green initiative was -- I can't find, at least when

13   I read through the materials, and the D.C. can point this

14   out to me perhaps, but the experience I've had in using the

15   green initiative in lieu of the tunneling and storage basin

16   approach, to show that the computer modeling is accurate, I

17   mean, what's it based off of?  What do we know about this,

18   how it works, this green initiative?

19             There was, apparently, a couple of small projects

20   the D of C was doing to see how it worked.  But I mean, what

21   do we have, experimentally wise?  What is known about this?

22   Have other major metropolitan areas done this successfully?

23   And did the water that they say will be retained come to

24   those results?  I don't know.

25             MS. FLICKINGER:  There is a growing body of data

1    -- and this might be something that D.C. Water also can

2    address.  There's a growing body of data from pilot

3    projects, like the small pilot projects that D.C. Water was

4    required to do under its 2005, 2010 Consent Decrees.  Other

5    cities have also been doing those kinds of pilot projects on

6    big scales, small scales.  So, there is data from that.

7         There are other federal Consent Decrees that

8    require green infrastructure.  This might be on a little --

9    a little more measurable kind of scale, slightly larger.

10   But there is experience from other cities across the country

11   and there are other federal Consent Decrees that have green

12   infrastructure components.

13        THE COURT:  I mean, is it the representation --

14   again, if this is D.C., they can answer this -- the

15   representation is that it's likely the new proposed CSO

16   controls would have the same result as the original controls

17   we instituted?

18        MS. FLICKINGER:  It's predicted based on computer

19   modeling, and this is kind of a widely accepted computer

20   model.

21        THE COURT:  Do you know what the margin of error

22   is in the calculations in the computer models?  Is there

23   various models with different results that are looked at?

24        MS. FLICKINGER:  I can't answer those questions.

25   I can tell you it's been -- the computer model, both for the

1   2005 Consent Decree and for this proposed amendment, has

2   been vetted by experts at EPA and properly calibrated and

3   people are comfortable with it.  I know some of the

4   commenters also looked at the computer modeling, the real

5   kinds of questions you're asking.  And they had their

6   experts look at them and they did not have negative comments

7   about the computer modeling.  It's -- it is -- you know, the

8   2005 Consent Decree is also based on computer modeling and

9   predictions of rainfall and that kind of thing.

10          THE COURT:  The justification for doing this is,

11  one, they say that the green initiative is socially,

12  economically preferable for the reasons given.  But, using

13  this then extends for five years the end date, at best, of

14  the completion of the attempts to correct the problems we

15  have on the Potomac River and the sewage overflow.  What's

16  the justification for going this way and extending it for

17  five years?

18          MS. FLICKINGER:  It does along the Potomac and it does

19  in Rock Creek.  But again, the Anacostia sewer shed will be

20  completed by 2025, and that's a big part of the settlement.

21          Green infrastructure is regarded both by the

22  environmental community, you saw those statements of

23  support, and by the federal government as having the triple

24  bottom line.  So it has environmental benefits other than

25  mere storm water retention.  There is data showing that it's

1    effective with storm water retention, but it also includes

2    improves air quality, reduces the heat island effect.  And

3    all of those are thought to be very important as climate

4    change makes temperatures warmer.

5         The local community is very interested in the

6    economic benefits because it gives employment to local

7    residents.  So, instead of having a construction firm come

8    in and build the tunnel, you have the revenues paid for

9    green infrastructure can be kept more in the local community.

10   And as you mentioned, then there are social benefits of

11   having -- having a psychological well-being.

12        So for those reasons, I think people are

13   interested in using green infrastructure on an appropriate

14   scale.

15        The green infrastructure program, which is in

16   Appendix F, we worked really hard on to address some of the

17   uncertainties that the Court is concerned about.  So there

18   are technical provisions in there to try to reach agreement

19   on frequency of inspection and the frequency of maintenance,

20   to try to anticipate some of the bureaucratic and

21   institutional barriers and to talk about those up front, to

22   make a requirement that the District of Columbia and D.C.

23   Water enter into an agreement and shoulder some of the

24   obligations to facilitate implementation of the

25   infrastructure.

13

1    It's also very carefully sequenced so that green

2  infrastructure won't be built all at once.  There will be --

3  a year from entry there will be some major plans that come

4  through, and then in Potomac there will be three projects.

5  And they're phased that way so that lessons that are learned

6  in the first project can be applied to the second project

7  and so on.  And that will help.  The same thing in Rock

8  Creek, there are five projects, and it's called adaptive

9  management.  And that should help with the learning curve in

10  terms of the efficiency of green infrastructure.  And then

11  importantly, there's a practicability determination.

12    So after the first project in each of the sewer

13  sheds, in Rock Creek and Potomac, D.C. Water will make a

14  practicability determination.  And if they look at the post-

15  construction monitoring, which will fall after each project,

16  they look at the results they're getting from the post-

17  construction monitoring, and if they conclude that it's not

18  practicable, considering the five factors that are spelled

19  out in Appendix F, then they will submit that report.

20  They're required to make that determination and submit that

21  report to EPA and then EPA will review that and see whether

22  it approves or disapproves that determination.

23    So, both in Rock Creek and in the Potomac there

24  will be a point fairly early on in the process to ascertain

25  whether it's practicable to continue or not.

1          THE COURT:  I assume the government has looked at

2     the issue, if this doesn't prove practical or doesn't

3     resolve the problem, as you think it would according to the

4     computer models, after five years you then would go back to

5     the storage basin and tunneling, which would be another five

6     to ten years.  I mean, I'm if I extend this five years we

7     could be extending it many more years because we don't know

8     if this is going to work.

9          MS. FLICKINGER:  So it's all supposed to be done

10    by 2030.  And the practicability determination falls fairly

11    early in that process.  And then there's a requirement, if

12    EPA and D.C. Water agree that it's not practicable to do

13    this in the very specific -- to the very specific extent

14    that's required there, then there's already written in a

15    requirement to return to the gray infrastructure, and that

16    has to be completed within nine years of that determination.

17          So, it falls basically within the same period of time.

18          THE COURT:  Some of the respondents, in the

19    response filed with the Court by the plaintiffs, indicate

20    concerns raising why the government would need, want 180

21    days to approve the D.C. Water's report and determination,

22    as mentioned.  And are you opposed to a hard 180 days, as

23    opposed to a soft?  It gives you more time, if you need it.

24    I mean, is there a rationale why you don't want that set in

25    stone?

1           MS. FLICKINGER:  I think we've resolved that

2    issue, with Earthjustice and we've worked out a resolution

3    to that that Miss Chavez can tell you about.  The EPA

4    wanted -- has this kind of affirmative enforcement Consent

5    Decree.  Doesn't impose legal obligations on itself, it

6    might get it in trouble with the Court, subject to fines or

7    penalties.  It's not a good idea when we enter into these

8    Consent Decrees, so we don't do that.  That's why its

9    written that way.  But, I think we have worked out with

10   Earthjustice a resolution to that concern.

11           THE COURT:  If, as an alternative, are you opposed

12   to amending the order to add a reporting requirement in the

13   event the EPA anticipates it needs more than 180 days to

14   respond?  And the citizen plaintiffs suggested that.

15           MS. FLICKINGER:  Yes.  We're very -- we think this

16   Consent Decree satisfies the legal standard.  It is a fairly

17   detailed and sophisticated agreement and it was discussed

18   for a long time by all three parties.  It's not something I

19   would casually go back and revise and amend.  We've looked

20   at the many comments we received, we didn't see anything

21   that warranted amending it.  What we've worked out with

22   Earthjustice -- and also, we don't want to have to notify

23   the Court and burden the Court with information that may not

24   really warrant the Court's attention.  It might be

25   premature.

1          So what we've worked out with Earthjustice is that

2    during that 180-day period, when we hit about the five-month

3    part, 150 days or so, if it looks as if that decision won't

4    be made within the 180 days, we will notify Earthjustice.

5    We will tell them, we will give an explanation and they will

6    then have that information.

7          THE COURT:  Does that leave, then, the Court sort

8    of out of the picture if 180 days goes by and you notify the

9    EPA's not ready to proceed, and another 180 days go by, and

10   another 180 days goes by and nothing happens, the District

11   is happy we haven't done anything.  Who is going to let the

12   Court know this isn't happening?

13         MS. FLICKINGER:  There's a couple of things.  The

14   180 days has a day-for-day extension if we go over it for

15   the affected deadlines.  It doesn't automatically -- it's

16   going to be a very fact specific exercise.  It doesn't

17   automatically extend the final date of 2030.  Okay?  It's

18   going to be, in my view, much more limited.

19         So, maybe it will impact immediate, near term

20   deadlines, but I think toward the end of the 2030 it would

21   be hard to argue that the practicability determination

22   really impacted those deadlines.

23         And then we have already, in the Consent Decree,

24   provisions for bringing matters to the Court if there's a

25   dispute that can't be resolved.  So, there's a -- there's a

1    very specific dispute resolution procedure in the Consent

2    Decree that we would use.  So by the time we come to court,

3    we know that the dispute truly can't be resolved.

4         THE COURT:  The other issues raised in the

5    responses motion -- response by the citizen plaintiffs

6    concerning the government, needed to provide estimates of

7    the runoff controls once this green initiative is completed,

8    the project is completed.  And apparently may not be

9    required to address actual shortfalls in the runoff

10    performance.  In other words, should the Court impose a

11    reporting requirement to assess whether or not these

12    projects have in fact achieved the degree of runoff that's

13    anticipated?  And is there --

14         MS. FLICKINGER:  So should the Court --

15         THE COURT:  Should the Court impose a reporting

16    requirement to assess whether the green infrastructure

17    actually in fact achieved the degree of runoff control

18    predicted in the modeling?  Or is that something that you

19    all determined, an estimate in there?  I don't know what

20    criteria you need to satisfy yourself it's working.

21         MS. FLICKINGER:  So I have concerns with the

22    reporting requirement.  But we have met with Earthjustice.

23    On Monday we had an extensive meeting with them and we're

24    continuing to try to work it out.

25         My concern with Earthjustice is that, again, we've

1      presented a whole amendment that's a negotiated package to

2      the Court and they're seizing on a word here or sentence

3      there and asking the Court to react to that and impose

4      obligations on the United States that aren't really warranted.

5              There are provisions in Appendix F that indicate

6      and support an interpretation, which is my interpretation,

7      that when you read it as a whole, that, of course, D.C.

8      Water has to actually attain the retention standard that's

9      required by Consent Decree.  And I can -- I can read those

10     citations into the record, if the Court would like.

11             But, I think what Earthjustice is doing is fixing

12     on one word and not reading the Consent Decree in its

13     entirety.  The Consent Decree can't terminate until the

14     provisions in the NPDES permit are satisfied.  So, before

15     the Consent Decree can terminate, we have to satisfy

16     ourselves that those retention standards have been met as

17     articulated in the permit, and then we come to court and the

18     Court can approve or deny our motion to terminate.

19             So that's a really important aspect of the Consent

20     Decree.  That's the way the 2005 Consent Decree is structured

21     and the provisions have not been changed.

22             THE COURT:  I don't think the Court either has to

23     object -- to accept or reject in toto the order submitted to

24     it.  The Court has an obligation to make sure it's done

25     appropriately and protects the public interest.  And I'm

1    concerned about the government says it doesn't want any

2    responsibilities of reporting to the court.  I don't understand.

3              MS. FLICKINGER:  The concern I -- so, the specific

4    request from Earthjustice is for each of the post-

5    construction monitoring reports, if EPA receives that report

6    and it shows that there is a shortfall, that we must

7    immediately contact the Court.  And, first of all,

8    Earthjustice is going to be receiving these reports.  Those

9    reports will be public and posted on D.C. Water's website at

10   the time they are communicated to EPA.

11             So, I don't think the United States should have to

12   shoulder that burden of reporting.  There are myriad ways

13   where if there's a shortfall in one of the post-construction

14   monitoring reports, it could be made up in a subsequent one

15   or there can be other kinds of fixes, additional work can be

16   required.  Where the United States views the Consent Decree

17   as requiring a certain amount of work to be required, D.C.

18   Water won't be in compliance with the Consent Decree until

19   that work is required.

20             And I just think it's unnecessary to impose a

21   reporting requirement on the United States, and it's going

22   to burden the Court, as well, when it may not be necessary.

23   If Earthjustice disagrees, they will have those reports,

24   they're in court, they can take appropriate measures.

25             THE COURT:  Okay.  And again, the bottom line, my

1    original comment was -- and where you come from, that I

2    understand the process you're looking at and the amendments

3    you wish to make and the use of the green initiative, what

4    is the rationale for agreeing to the change for the

5    government using a new, somewhat unproven result methodology,

6    versus one that will work?  I mean, what is the change of

7    heart from the original agreement?

8              MS. FLICKINGER:  Because we think it has a lot of

9    benefits.  If it's used in a targeted way on an appropriate

10   scale, which is what the proposed amendment plans for, we

11   think it has a lot of benefits that gray infrastructure does

12   not have.  So the tunnels, for example -- and that's the

13   triple bottom line, and a lot of people feel strongly that's

14   a good way to go here in the District of Columbia, at least

15   to the extent in the areas that are contemplated.

16             THE COURT:  All right.  Thank you, Miss

17   Flickinger, appreciate it.

18             I'll hear from the D.C. Water Authority.

19             MS. FLICKINGER:  Thank you, Your Honor.

20             MR. EVANS:  Good afternoon, Your Honor.  David

21   Evans from the District of Columbia Water and Sewer Authority.

22             THE COURT:  Thank you.

23             MR. EVANS:  Let me first address the Court's

24   question that I -- why D.C. Water selected green

25   infrastructure and why it believes it can be successful with

1    its green infrastructure projects.

2              First, as you may recall, the original Consent

3    Decree did require D.C. Water to install green infrastructure

4    in its facilities in the District.  And it has done that.

5    In addition to that, since 2011 it has invested over $14 million

6    investigating green infrastructure, modeling, studying sites

7    within the Potomac and Rock Creek watersheds that might be

8    suitable for green infrastructure, done extensive modeling

9    and gotten to the point where it concluded that it is

10   confident that it can in fact implement green infrastructure

11   in accordance with the requirements of the amended decree

12   and can achieve the retention standards called for in the

13   decree.

14             THE COURT:  So your determination of the use of

15   rain barrel, cisterns, bio retention and porous --

16   impermeable pavement would substitute sufficiently for the

17   original agreed-upon tunneling and storage retention that

18   was planned?

19             MR. EVANS:  Well, Your Honor, that's the types of

20   green infrastructure you just mentioned, or just samples of

21   the kinds of green infrastructure that --

22             THE COURT:  That's what was in the brief to me.

23             MR. EVANS:  -- would be installed.  There are a wide

24   varieties of green infrastructure that have been utilized

25   successfully in other projects around the United States.  I

1    might add, and I guess Miss Flickinger pointed out, green

2    infrastructure is being employed in a number of other CSO

3    control projects by municipalities around the country.  And

4    again, D.C. Water has investigated this intensively.  It

5    would not have undertaken to commit to installing green

6    infrastructure on this scale unless it's confident that it

7    could in fact be successful at that.

8         I might add, Your Honor, if you'll look at the

9    area that they call for green infrastructure, in reality, as

10   you can see, in the Potomac and Rock Creek sewer sheds,

11   really there are three controlled approaches that are

12   proposed there; one is green infrastructure and the other is

13   sewer separation and the other is tunnel system.  That was

14   done for a purpose.

15        D.C. Water investigated this area extensively,

16   intensively to identify the areas within the sewer shed, the

17   sewer sheds that are suitable for green infrastructure.  It

18   doesn't just arbitrarily draw lines and say we'll just try

19   green infrastructure here.  It investigated it thoroughly to

20   make sure -- and it selected only those areas for green

21   infrastructure that it was confident that could be --

22   successfully receive the amount of acreage to be treated

23   with green infrastructure to the 1.2 inch retention

24   standard.  The areas that they felt were questionable or

25   might not be suitable for green infrastructure, they either

1    separated those areas or they're going to control those

2    areas with the tunnel system.  So there was a greet deal of

3    effort put into selecting areas.

4                THE COURT:  In switching the tunnel system in the

5    remaining tunnel that you propose to a gravity-fed tunnel, but

6    not a storage and then a pump-out system, as I understand it.

7                MR. EVANS:  Yes, sir.

8                THE COURT:  How does that work?  Does it reduce

9    the flow going into Blue Plains in a large storm?  If the

10   water just flows through the tunnel and back into Blue

11   Plains, how does it not then overflow again?  How does that

12   work, if you don't retain the water for a while, until --

13               MR. EVANS:  The tunnel system, when these projects

14   are completed, there will be 187 million gallons of storage

15   capacity.  It's all tied together.  And if you look at the

16   yellow line -- could I have a new pointer?  This one isn't

17   working.  Thank you.

18               If you look at this tunnel system, this is

19   157 million gallons, it goes all the way down to Blue

20   Plains.  The 30-million-gallon gravity tunnel serving the

21   Potomac and portions of Rock Creek ties into that tunnel.

22   What will happen is when it rains, water will flow -- and

23   again, depending on -- rainfall patterns vary.  In the

24   summer months you could have rainfall just in one area or

25   another.

1    But let's say, for example, you have a rainfall

2    that's widespread, throughout the entire city.  These

3    tunnels will fill -- first, water will go into the capacity

4    of the existing combined sewer system.  We have other

5    pumping systems that are not shown here.  Water will go into

6    those existing intercepters and only when those intercepters

7    are full and can't get any more, without the tunnels it

8    would overflow into the river.  Instead, it will overflow

9    into these tunnels.  That water will then flow down these

10   tunnels.

11   And if you think of it as a bathtub effect, the

12   tunnels will gradually start to fill up because it's driven

13   by gravity.  Gradually start to fill up, until you have

14   187 million gallons of flow in here.  All the while this is

15   occurring, Blue Plains wastewater treatment plant can be

16   treating over 500 million gallons at a rate of treating --

17   combined sewer flow at a rate of over 500 million gallons

18   while these tunnels are filling up.  They're not storing the

19   water, they're conveying it.  They're storing it and

20   conveying it while Blue Plains treats it.  As part of the

21   upgrades, we have advanced technology employed that will

22   give D.C. Water the capacity and capability to treat up to

23   225 million gallons per day of wet weather flow.

24   So you've got these advanced treatment facilities

25   at Blue Plains that are treating this water as it comes down

1    the tunnels, so the tunnels just aren't all filling up

2    before treatment occurs.  The tunnels are receiving the

3    flow, they're gradually filling, all the while the wet

4    weather treatment facilities at Blue Plains are treating

5    that flow and have the capacity to empty the tunnels within

6    24 hours after rainfall stops.

7         The great advantage of having this gravity tunnel,

8    as opposed to a storage tunnel in the current plan, is that

9    it allows -- essentially combines that capacity throughout

10   the entire system.  So you don't just have 58 million

11   gallons of capacity in the Potomac as we do in the current

12   plan, of storage capacity, we now have essentially all of

13   the 187 million gallons of capacity available to the Potomac

14   and Rock Creek, which we did not have before.

15        THE COURT:  Let me interrupt.  You're going to

16   reduce, aren't you, the size of the Potomac tunnel to 30

17   million gallons, instead of 58 million?

18        MR. EVANS:  30 million.

19        THE COURT:  And it's not a storage tunnel, it's a

20   flow-through tunnel by gravity?

21        MR. EVANS:  That's a function of the fact, as I

22   mentioned, you've got much larger capacity now by combining

23   the tunnel systems together into one system.  Also, we have

24   two sub-sewer sheds that are being treated with -- or, being

25   dealt with through separation, and then we have the green

1    infrastructure in the rest of the Potomac sewer shed and the

2    Rock Creek sewer shed.

3         I might also add, Your Honor, in addition to

4    having invested millions of dollars studying and planning

5    for and site selection for the green infrastructure, we have

6    built into the Appendix F of the Consent Decree, as Miss

7    Flickinger discussed, a process where after the first

8    projects are completed, first green infrastructure projects

9    are completed in each sewer shed, D.C. Water will take an

10   intensive evaluation of those projects to determine, you

11   know, among other things, whether or not in fact they

12   achieve the 1.2 inch retention standard.

13        If they determine that they can't get that to that

14   retention standard with -- or, make up if there's a

15   shortfall, and they can't make up that shortfall and get to

16   the 1.2 inch retention standard before they complete all the

17   projects in that sewer shed and so that they can't

18   ultimately achieve the requirement of the Consent Decree,

19   then we have the go, no-go decision, where they report to

20   EPA that we don't think we can make the standard and we'll

21   go back to the gray controls.

22        And as Miss Flickinger mentioned, that does not

23   involve -- as long as we stay within the 180-day approval

24   period, the gray controls will be completed within the same

25   timeframe as the green controls.  So there will be no

1    additional extensions beyond the deadlines that are now in

2    the Consent Decree.  The only potential for an extension

3    would be if, in fact, the EPA were to take beyond 180 days

4    to approve the District's decision to either continue with

5    green infrastructure or to move over to the gray infrastructure.

6         THE COURT:  You have the five-year extension.

7         MR. EVANS:  The other reasons for the extension,

8    in addition to the need to take a very deliberate, adaptive

9    management approach to the installation of green

10   infrastructure, one reason why we believe it's appropriate

11   to have the five-year extension for the extension for the

12   infrastructure is D.C. Water wants to make sure these

13   projects are successful.  It has been tremendously

14   successful in meeting projects to date.  It has either met

15   or exceeded the deadlines in the Consent Decree.

16        It has come up with innovative solutions in the

17   proposed amendment and in the 2007 total nitrogen wet

18   weather plan, to make this a much better plan than the one

19   we have in the 2005 decree.  It takes great pride in,

20   rightfully takes great pride in its ability to get these

21   projects done.  They are massive projects.

22        I won't take the time to explain all of the

23   obstacles that D.C. Water has encountered and overcome in

24   the course of implementing these projects up to this point,

25   but I think it's record to date in the implementation of the

1    current Consent Decree demonstrates its ability to overcome

2    obstacles and to get the projects done on time, if not ahead

3    of schedule.  It would not have committed to do this if it

4    didn't believe it could get it done, and it would not

5    believe it could get it done if it hadn't invested a lot of

6    time, effort, and science into selecting the sites for green

7    infrastructure and technologies it proposes to employ.

8              THE COURT:  As for the green infrastructure sites,

9    as I understand it, you're anticipating using public lands,

10   but may go to private land, if necessary?

11             MR. EVANS:  It will be mostly public lands, Your

12   Honor, with the potential there be some private lands.  But

13   I think the first priority is to put it on public space;

14   roads, sidewalks, public buildings and the like.  This is a

15   joint effort in part of both District of Columbia Water and

16   Sewer Authority and the District of Columbia government.

17   They will be working in partnership with each other to see

18   that this gets done.

19             THE COURT:  And the -- one issue you said caused

20   some delays, or may cause delays, environmental impact

21   statements when you're going to go on federally owned land,

22   that is, Park Service land?

23             MR. EVANS:  That's one of the reasons for the

24   extension.

25             THE COURT:  You couldn't have anticipated that it

1    had to be EIS?  Every time I turn around I get a suit

2    involving EIS, and people think they have to do it -- the

3    government does, anyway.  It's not unusual.

4         MR. EVANS:  Your Honor, there was no way -- there

5    was no way to anticipate that National Park Service would

6    have demanded an EIS.  We were totally surprised that they --

7    I don't know that we can say we were totally surprised,

8    there was a concerted effort made by D.C. Water to overcome

9    National Park Service objections after extended discussions

10   back and forth and suggestions on how the impact on the

11   parklands along the Potomac River could be minimized for a

12   larger tunnel.  Ultimately the National Park Service decided

13   they wanted to have the environmental impact statement.

14         So, yes, if we were to proceed with the original

15   58-million-gallon storage tunnel, we do face the potential

16   for some significant delays as a result of the EIS process.

17         I might also add, Your Honor, that another reason

18   for the extension is just the tremendous project and the

19   impact they're having on the ratepayer.  If I could, Your

20   Honor, I would like to show Your Honor a slide.  Your Honor,

21   if you could go to slide number 6.

22         THE COURT:  Turn on the big computer, too.  It's

23   on the computers on the table.

24         THE COURTROOM DEPUTY:  Yes.

25         MR. EVANS:  Maybe if I could start here, Your

1    Honor, slide 6.

2              THE COURT:  There is the CSO reduction?

3              MR. EVANS:  This shows the progress to date.  And

4    I think it's -- it shows just how remarkable, remarkably

5    successful D.C. Water has been at implementing these

6    projects and achieving a high level of CSO control.

7              On the far right is the total system.  As you can

8    see, we start with about 32 -- I mean, about over 3 billion

9    gallons of overflow on an annual basis.  And then incrementally,

10   2015 -- today we're down, we've cut that by about one-third,

11   and then in 2018 we'll cut it by over a half, total system

12   wide.  And, of course, when it's completed it will be -- it

13   would be about 4 percent of the original overflow.  We have

14   a total -- when we complete these projects we'll have a

15   total -- controlled CSOs on the total system basis at

16   96 percent; 98 percent on the Anacostia river, which is

17   the -- which is the system with the greatest impacts.  On

18   the Potomac River the controls would be about 92 percent, on

19   Rock Creek about 96 percent.

20             So we're looking at significant controls being

21   brought online, significant reductions being achieved as the

22   project moves forward to completion.  But as you can see, as

23   of today, almost -- almost half of the CSO reductions have

24   been achieved in the Anacostia watershed.  Obviously we

25   haven't achieved as much reduction in the Potomac or Rock

1  Creek because those projects -- while there have been some

2  projects implemented in those watersheds, we really have not

3  started those projects yet.  So it's been remarkable

4  progress in the last ten years since the Consent Decree was

5  there.

6         On slide 7, that shows budget and total cost.  As

7  you can see, Your Honor, for -- and the red is the Anacostia

8  River System, the green is the total program cost.  Total

9  budget now for completing these project is over $2.6 billion.

10  That's in addition to $950 million of cost resulting from

11  installing total nitrogen technology, state of the art

12  nitrogen technology to achieve the Chesapeake Bay nutrient

13  reduction requirements.  And that was the reason for the

14  changes that were made in 2007, to accommodate that.

15         So we have total project cost $3.5 billion for the

16  Clean River Project.  That's apart from other projects that

17  D.C. Water is undertaking, both on the water and sewer --

18  and the sewer side.  Of that, over $1 billion in contracts

19  have been let, total program, much of that the Anacostia,

20  and almost $1 billion has been spent to date.  That's a lot

21  of money and obviously somebody has got to pay for it, and

22  it has to be paid for by the District of Columbia ratepayers.

23         The line you see on slide 8 is the projected rate

24  increases that will occur between now and 2032.  At present

25  the average annual sewer bill is about $500.  That's

1    projected to go to $1200, almost triple by 2032, and that's

2    with the relief that we would receive from this amended

3    Consent Decree.  One of the benefits of the amended Consent

4    Decree is that it allows D.C. Water to stretch these

5    projects out a little bit longer so that the pace of the

6    rate increases isn't quite as steep.

7         Also, D.C. Water, in an effort to provide some

8    rate relief, has gone back and taken a hard look at the

9    other project, projects above and beyond the projects

10    required and undertaken by the Consent Decree, looked at

11    ways to prioritize those projects.  Push some projects not

12    particularly essential, push those off.

13         So the line you see is still the rate increases

14    we're looking at with the amended Consent Decree with the

15    extended schedule and the project prioritization.  If the

16    Consent Decree was not amended, we stick with the 2025

17    deadline, and if we didn't do the -- did do the priorities,

18    we would being looking at rates that would go up to about

19    $1700 a year.

20         So, there are huge rate impacts.  And one of the

21    purposes of this amended decree is to provide rate relief,

22    some rate relief to the residents of the District of Columbia.

23         I might add, if you look at slide 9, when you look

24    at where the greatest impact will be, it is really on the

25    minority communities in the District of Columbia.  The red

1    represents the 40th percentile of residents.  These are the

2    poorest 4 percent -- 40 percent of the District residents.

3    EPA has established 2 percent of median household income, or

4    2 percent of household income as an indicator for projects

5    that are simply unaffordable by residents.

6            So if you look at the top couple of blocks, the

7    blocks in red showing minority communities, those in red are

8    minority communities that are projected to have rates at or

9    above 2 percent of median household income, even with --

10   this is with the extended schedule and the project

11   prioritization that D.C. Water has developed.

12           D.C. Water has put in place some measures designed

13   to subsidize rates for the lowest income families.  But,

14   still, it hasn't provided enough relief to keep them below

15   2 percent of median household income.  D.C. Water's board is

16   committed to looking for ways, as these projects go forward,

17   to try to find ways to reduce the burden on poor and

18   minority communities.  But still, this is a huge burden on

19   the community.

20           So I want to be sure the Court understands that

21   the purpose this amendment is not just to give us the time

22   we need to implement green infrastructure, but also to

23   provide some rate relief to these -- to hard-pressed

24   residents.  And then, of course, if you look at the

25   District's -- the wards within the District, as you can see,

1    those are the wards in the District that are most heavily

2    impacted by the kinds of rate increases that we've been seeing.

3            Again, I won't take the time to go over this

4    because we've already talk about it, but additional

5    justification really involves the complexity of trying to

6    install green infrastructure in a heavily developed area.

7    As I'm sure the Court is aware, the Georgetown area and

8    surrounding areas that will be the subject of the green

9    infrastructure insulations is heavily developed.  It's going

10   to take a tremendous amount of work with the neighborhood,

11   coordination with the District of Columbia government, with

12   agencies that have jurisdiction over the projects that go

13   forward in these districts, many of them are historic areas.

14   And so it's going to take a lot of coordinated effort.

15           D.C. Water has learned from the work it's done to

16   date in implementing the tunnel system to date and all the

17   other projects it's implemented, that it is time consuming

18   and difficult to secure all the easements and rights of way

19   approvals that it needs just to install tunnels 100 feet

20   underground.  So you can imagine how much coordination and

21   work and effort will have to go into literally tearing up

22   parts of public space, the roads, the sidewalks, other areas

23   in order to convert them from gray to green infrastructure.

24   And so, the -- again, all of this has been carefully planned

25   out by D.C. Water to it make sure it can get these projects

1    done and done successfully.

2            THE COURT:  Where and what were your pilot green

3    infrastructure projects you're basing your computer modeling on?

4            MR. EVANS:  It's based on the experience they've

5    had installing their own green infrastructure.  There's a

6    tremendous amount of literature on green infrastructure.

7    This is not new technology.  This is technology that's been

8    installed in a number of municipalities around the country

9    for both storm water control and CSO control.  So a lot has

10   been written about it.

11           The unknowns -- or, to the extent there's

12   uncertainty about green infrastructure, it's not that green

13   infrastructure works or that certain types of green

14   infrastructure technologies work, it's the difficulty in --

15   to the extent there's uncertainty, is taking that green

16   infrastructure that's worked in other places, other types of

17   soil, other types of topography, the physical characteristics

18   of an area that do affect the success of green infrastructure

19   installations.

20           So, we know green infrastructure works.  And so

21   D.C. Water has been able -- taking the knowledge that it has

22   gained from successful insulations elsewhere around the

23   country, from the installations that it's installed at its

24   own facilities, and the information available from

25   successful installations elsewhere, has put that together

1    with the information it has on these carefully selected

2    areas where it proposes, it's all -- computer modeled that to --

3            THE COURT:  When I read through your materials, I

4    thought that you had a couple local ones that you installed

5    and were testing.

6            MR. EVANS:  Yes.  Those are at the D.C. Water

7    facilities around the District, yes.

8            Finally, Your Honor, just for comparison purposes,

9    so the Court understands, that what we're proposing here,

10   we're not getting way out ahead -- we're not getting way

11   beyond what others are doing.  As you can see, this is just

12   a sampling of other major CSO cities around the country and

13   what they're doing and the timeframes that they have for

14   implementing their controls.

15           As you can see, every other major municipality on

16   this list has a 25-year schedule, and they all had green

17   infrastructure, significant green infrastructure components

18   built into their plans.  They all have 25-year implementation

19   schedules.  D.C. Water has a 20-year schedule, so extending

20   their schedule by five years will bring D.C. Water's

21   implementation schedule in line with the schedules that

22   other major municipalities around the country already have.

23           And I might add, Your Honor, that's despite the

24   fact that these other communities, as you can see, have far

25   lower control requirements than does D.C. Water.  D.C. Water

1      has a requirement to achieve overall removal rate of

2      96 percent, which is significantly above the control

3      requirements of these other localities.  And I think I can

4      safely say that few, if any, other municipalities around the

5      country have a control requirement as high as D.C. Water's

6      where they are not totally separating their sewer system.

7      Obviously, if you separate your system, you will have

8      achieved 100 percent control.  But I don't believe there's

9      another municipality in the country that's required to

10     achieve a level of control higher than D.C. Water and still

11     retain its combined sewer system.

12             THE COURT:  The suggestions by the original

13     plaintiffs in the case assert that there could be an

14     indefinite extension of the schedule and then there should

15     be an addition by the Court of some type of fixed date

16     project implementation, project schedule that we should

17     have.  And they've raised that as a concern.  I mentioned

18     that to the government.  How would you respond to that?

19             MR. EVANS:  Your Honor, first I would say that

20     D.C. Water will be as upset by an extension beyond 180 days

21     as would the citizen plaintiffs.  D.C. Water has mobilized --

22     is mobilized for these projects, so delay costs D.C. Water

23     money.  It simply can't afford to have its consultants,

24     contractors, and employees that have been dedicated to this

25     program sit idly waiting for an inordinate amount of time

1    for it's proposal to either proceed with gray or green

2    infrastructure idly by.  So we would be as upset as the

3    citizen plaintiffs.

4           And frankly, Your Honor, we don't believe that --

5    while there's certainly no guarantee, we, the District of

6    Columbia, don't believe that we're going to -- there's going

7    to be a need for that day-for-day extension.  District of

8    Columbia water and sewer authority and EPA have worked

9    extremely well together during the implementation of the

10   original Consent Decree up to this point.

11          I think the fact that we have the extensive

12   amendments to the plan that occurred in 2007 as a result of

13   the total nitrogen requirement, the fact that D.C. Water was

14   able to work closely with EPA to get those projects done

15   without delaying project implementation under the original

16   schedules, I think is evidence of the fact that D.C. Water

17   and EPA have shown, over the last ten years, that they're

18   able to work together and get these projects implemented in

19   a timely way.

20          Yes, there is a provision in the decree which

21   would allow for a day-to-day extension.  We, frankly, don't

22   believe that's going to be necessary.  D.C. Water, for its

23   part, certainly will do everything it can to make sure that

24   the approval or disapproval occurs within that timeframe.

25   As far as D.C. Water is concerned, the sooner the better.

1    Delay means money for D.C. Water.  It wants to get these

2    projects done.

3         THE COURT:  One of the issues they raised was that

4    the Court should require the government notify the Court --

5    and the government doesn't think so -- but, whether this

6    green initiative project, in fact, decree, actually achieved

7    the degree of runoff control predicted in your modeling.

8    And if it doesn't, then the government should be required to

9    have an explanation of the steps they're going to take to

10   attain the equivalent reductions, along with your group, and

11   how long that would take to complete that.

12        I mean, is there a concern about requiring that

13   the Court be notified if these projects don't work, and so

14   that there's some public response that's available to make

15   sure that these runoff controls are operating as predicted?

16   Is there some way the public can be informed and know about

17   this?  You put everything on your web page, the results of

18   your testing?

19        MR. EVANS:  We think it's already provided for.

20   First, we've committed to post all of the reports on our

21   website.  So the citizen plaintiffs and the public in

22   general will have all of this information at the time it's

23   submitted to EPA.

24        The -- the decision -- we will know, D.C. Water

25   will know, after the installation of the first projects in

1    each of these watersheds, the Rock Creek and Potomac, the

2    Consent Decree requires that D.C. Water undertake post-

3    construction monitoring for each of the projects along the

4    way to in fact determine whether or not the 1.2 inch

5    retention standard has been achieved.

6         If that -- if the project report -- let's say

7    we're talking about the first project, which is very early

8    in the schedule, and it's found that we're coming up short,

9    let's say we're getting 1.1 or 1 inches of retention in some

10   or all of the projects of that one, if D.C. Water at that

11   point has to make a decision, is the shortfall and our

12   ability to achieve that retention standard so great, and

13   looking ahead at the other projects and what we know about

14   what we have to deal with, is it so great, are the obstacles

15   we face so great that we just don't think that when the

16   projects are done in each watershed that we can achieve the

17   1.2 inch retention standard?  That -- that, and there could

18   be other grounds as well.  I don't mean to suggest this is

19   the only ground.  And what D.C. Water would probably do is

20   issue a report to the EPA and say, in essence, we've done

21   the post-construction monitoring on the first projects,

22   we've fallen short of the 1.2-inch retention standard, we

23   don't think we can make up that shortfall in the remaining

24   projects in that watershed, so we want to go back to the gray.

25        Or, it may find that we felt short, but we know

1    what the problem is and we can make up the difference.

2    We're confident that either in the next series -- in the

3    next project or the project after that or before all the

4    projects are completed in the watershed we can make up the

5    shortfall in that first project.  And for that reason, Your

6    Honor, we think that requiring the government to submit a

7    report, if after that first project was completed, if we

8    determine we're coming up short and D.C. Water thinks it can

9    make up the shortfall, it might not make it up in the second

10   project or all of the second project, but it can make it all

11   up before it gets to the end of project, then we think it

12   would be premature, then, to notify the Court that we have a

13   shortfall in achieving the 1.2-inch retention standard after

14   the first project, when in fact D.C. Water believes it can

15   make up that difference.

16           So we would be injecting the Court back into the

17   proceeding when in fact -- yes, it's an issue after the

18   first project is completed, but D.C. Water, having gone

19   through the process of installing the first project in the

20   sewer shed, can -- has determined what the problem is, what

21   it needs to do differently or in-addition-to in the

22   subsequent projects in order to make up the difference.

23           So we think it would be premature to bring the

24   Court back into that when, in fact, it's a shortfall that

25   can be made up in subsequent projects.

1          THE COURT:  All right.  Anything else you want to

2      address?

3          MR. EVANS:  I would add, Your Honor, I believe the

4      second issue raised by the citizen plaintiffs was -- was, at

5      least, the question whether the obligation to achieve the 1. --

6      whether the 1.2-inch retention standard was a consensual

7      obligation.  We will state for the record, D.C. Water

8      believes it is an obligation.  It doesn't have any

9      stipulated penalties associated with it, but we believe it

10     is an obligation.

11          In fact, there would be no need, Your Honor, for

12     this -- the post-construction monitoring in the go, no-go

13     decisionmaking that would need to occur after the first

14     project if we didn't believe it was an obligation that we

15     have to achieve under the Consent Degree.  And ultimately it

16     eventually is going to be required as a permit requirement

17     anyway, when the permit is reissued.  And we so stipulated

18     to the citizen plaintiffs.  They have to speak for themselves,

19     but I believe they're satisfied that my representation,

20     together with Miss Flickinger's, satisfies their concern on

21     that point.

22          THE COURT:  I didn't ask for it because my reading

23     of it, I thought it was a requirement.  It is an obligation

24     that you've agreed to meet and I'm not that concerned about

25     that.  All right.  Anything else at this time?

 1              MR. EVANS:  No.

 2              THE COURT:  All right.  Any of the original

 3     plaintiffs wish to be heard?

 4              MS. CHAVEZ:  Yes, Your Honor.  Thank you.

 5     Briefly.  My name is Jennifer Chavez.  I'm here on behalf of

 6     the citizen plaintiffs.

 7              THE COURT:  Hello, Miss Chavez.

 8              MS. CHAVEZ:  D.C. Water and the U.S. have done a

 9     good job of answering all of your questions, which really

10     reflect our major concerns about the proposal.  I just want

11     to reiterate a couple of very important points about the two

12     specific issues that we raised in our response to the

13     government's motion to enter.

14              You know, stepping back and looking at the big

15     picture, the citizen plaintiffs do remain very concerned

16     about delay in general under this plan.  Because, you know,

17     we're talking about raw, untreated sewage being discharged

18     into water that they and their children actually use and

19     make contact with.  And so delays are, in general, a major

20     concern.

21              We look at this as a whole package and agree that

22     there are meaningful benefits associated not only with the

23     green infrastructure, but the reengineering of the tunnels,

24     and have decided that, you know, rather than focusing on the

25     five-year extension, we focused in our response on the

 1      potential for further delays beyond that.

 2              We also, of course, focused on the related issue,

 3      really, the enforceability of the 1.2-inch retention

 4      standard and the certainty that that would be achieved, as

 5      well as the 180-day EPA approval action that includes a

 6      built-in automatic extension.  So, I just want to recap our

 7      discussions with EPA and D.C. Water since we filed our

 8      responses and where we're at now.

 9              We continue to think that our concerns about the

10      1.2-inch retention standard are valid.  EPA and D.C. Water

11      have both represented to us and to this Court today that it

12      is not only the intent, but the effect of the Consent Decree

13      language that EPA and D.C. Water must determine and

14      demonstrate that the projects do actually achieve the 1.2-

15      inch retention standard, 1.2-inch retention as a performance,

16      and that D.C. Water would be obligated to undertake

17      contingency measures if that is not achieved.

18              And so based on those representations, assuming

19      that EPA and D.C. Water agree with what I just said, we are

20      satisfied that the decree itself ensures that performance.

21      And that, coupled with our access to post-construction

22      monitoring data and reports, will enable us to inform the

23      Court if things are really going in the wrong direction and

24      if things -- if the projects have not performed as achieved.

25              The second issue that we raised is this indefinite

1    automatic extension.  EPA has proposed that slightly

2    different from the reporting requirement that we proposed in

3    our response.  EPA would provide the citizen plaintiffs,

4    through counsel, of course, with a nonconfidential notice at

5    the 150-day mark, informing us whether it anticipates that

6    its determination will not be completed by 180 days,

7    including an explanation -- or, an estimate of when it will

8    be completed.

9            And our primary concerns about that indefinite

10    extension are all addressed there.  We will have notice in

11    advance, we will have the information about -- at least an

12    estimated completion date, and that will enable us to

13    satisfy ourselves that the delay will not be undue or

14    indefinite.  And we will be able to inform the Court and

15    request a status conference, if necessary, if it looks as

16    though there will be indefinite delay.

17            So based on that agreement, we are satisfied, and

18    I should mention, are happy to withdraw our request for

19    slightly different relief that we've laid out in our response.

20            I'm happy to answer any other questions, if Your

21    Honor has them.

22            THE COURT:  No.  I appreciate the work and the

23    contributions you and the other plaintiffs have made to this

24    case.  I thank you.  That's fine.

25            All right.  The government have anything else?

1    Nothing else?

2              (Pause.)

3              MS. FLICKINGER:  Your Honor, I just have one minor

4    factual issue.  You talked about the permit, which I called

5    a 2010 permit, as having expired in 2010.  But, in fact,

6    it's a five-year permit, so it expired in September 2015.

7    So it's just a minor factual thing, but I just wanted to

8    correct that for the record.  Its only recently been expired.

9              THE COURT:  Thank you.  All right.  The Court is

10   going to issue a bench ruling on this matter at this time,

11   having heard the presentations of counsel for the United

12   States of America and the District of Columbia Water and

13   Sewer Authority, and the representation on behalf of the

14   plaintiffs, at least one of the plaintiffs.  The others I

15   think have agreed with their position, the other plaintiffs.

16              I'll just note historically that the plaintiffs,

17   individual group plaintiffs brought this litigation, not the

18   government, the EPA and the Justice Department.  It was

19   first brought by the environmental groups who were

20   rightfully concerned about the conditions of the Potomac

21   River and the Anacostia River watersheds, part of which is

22   the Rock Creek watershed.  And that thereafter, after the

23   litigation was begun, was underway, the United States

24   decided to join.  As a result of which eventually there was

25   the trial schedule, there was a resolution with the Consent

1    Decree that was entered as then discussed in 2005.

2         The case began in 2000.  We're now in our 16th

3    year.  The Consent Decree provided for the abatement of the

4    overflows of untreated sewage as a result of storm runoff

5    because of the combined systems, the storm and sewer systems

6    into the Potomac River beginning up by Key Bridge, down

7    through the Kennedy Center and then into the Anacostia area

8    as well, by the construction of these -- I'll call them

9    tunnels for shorthand, but containment tunnels and storage

10   facilities and pumping facilities.

11        And after that has begun and the work has begun on

12   that and the city has commenced with that and -- the water

13   authority, with the city, has commenced on this, they've

14   made substantial progress along the Anacostia waterfront, as

15   they've shown.  And have requested the Court to accept the

16   first amendment to the Consent Decree and enter that

17   amendment.

18        There was filed with the Court the first amended

19   Consent Decree, basically, which consists of the materials

20   that were discussed.  It's 55 pages in length, with the

21   signature lines on it, with multiple attachments.  The first

22   attachment, A, being 550 pages to print out actually, which

23   I didn't do, along with the other -- although I have it on

24   my computer, the other materials that are attached through

25   F, Appendix F.

1          When I went through the materials, one of the

2     factors that the proponents of this decree rely upon is that

3     the GI, meaning green infrastructure projects, can provide

4     an earlier CSO reduction than all-gray projects because they

5     can be brought online in many small project forms, and that

6     the gray CSO projects can be brought online when all the

7     elements have been completed, which makes common sense, it's

8     true.

9          Additionally, represent that they're basing their

10    recommendations, the government and the water authority,

11    that the modeling analysis, referring to 2.7, the December

12    2014 summary, attached as F, Appendix F, that the focus on

13    the aggregate of each area of impervious cover type, without

14    regard to public or private ownership.  For scenarios that

15    examine a high level of GI controls, it's possible

16    opportunities for private GI implementation could be

17    limited.  In these cases it is assumed -- that gave the

18    Court some pause -- assumed that opportunities exist on

19    public property to compensate for the lack of opportunity on

20    private property.

21         The water authority has answered the Court today,

22    that they have been identified, identified public properties

23    and are ready to proceed with this green initiative.

24         That's Exhibit E, not F.  I'm sorry.  Exhibit E,

25    Appendix E.

1           The Court has several questions, obviously,

2     questions -- in questioning the government, as well as the

3     water authority, the D.C. Water authority, as to these

4     suggested changes in the Consent Decree, to make sure it was

5     consistent with the public interest, that it was technically

6     adequate, that it could actually work to accomplish the

7     goal; ultimately cleaning up the water, the environment, and

8     it is a fair -- the court cases talk about being fair

9     procedure substantively.

10          The government says that the proposed amendments

11    are reasonable and fair because it's technically adequate,

12    it contains well-thought-out provisions to ensure the green

13    infrastructure installation, if performed properly.  And if

14    not, then the deficiencies would be detected and corrected

15    or other alternatives, reverting back, essentially, to the

16    original plan.

17          That had some issues with the original plaintiffs

18    in the case who were concerned about the enforceability and

19    the delays inherent in switching over to green infrastructure.

20    They have indicated they, based upon the representations

21    submitted in court here today made by the government,

22    federal government and the D.C. Water authority, that they

23    are bound by this agreement and that the 1.2 figure is

24    binding and enforceable and there will be no delays beyond

25    that called for in the agreement; that is, the 180 days

1    would not present a problem where it would be continued and

2    would be one extension after another.

3            All the respondents to the public comments, after

4    this was announced, including all the plaintiffs in this

5    case, basically for those who commented on this at all out

6    of the 60 or 70 comments, asserted that the green

7    infrastructure is desirable.  It has the potential to

8    provide economic and social benefits, in addition to the

9    environmental benefits with CSO reductions.

10           The Court had some scepticism because it seems to

11   me that the -- at least the briefing I was given, indicated

12   certain assumptions through computer modeling and certain

13   predictions based upon limited experience of local projects

14   for green infrastructure which apparently, as of today, at

15   least, consist of those at the water facility itself only.

16   And to the -- no detail as to where and how there's going to

17   be this land available to make this green infrastructure

18   work, and this concerned the Court.

19           I think that the plaintiffs candidly admitted to

20   the Court today that they're satisfied now, after hearing

21   the presentations, as to there would not be indefinite

22   delays and that there would be adequate public input and

23   information given to the public, should there be concerns on

24   the green infrastructure not proving itself out, that would

25   not then further then delay this project.

1          There have been representations to the Court by

2     officers of this court, the lawyers, that they deem the

3     requirements in the amended Consent Decree here as binding

4     and enforceable, and that they would do publication on their

5     web pages, etcetera, as to any failures for the green

6     infrastructure to provide the proper results as has been

7     stipulated in the agreement.  So that the plaintiffs could

8     be apprised of what the situation is and they would be

9     apprised if there are delays, delayed date of completion, or

10    other things that would be done to attempt to ensure that

11    this would in fact achieve the degree of runoff that's

12    predicted in the D.C. Water authority's modeling.

13          So that I believe that their response has been

14    adequately covered by the responses today and the

15    explanation how the agreement is understood by the parties.

16          So, under the authority of the Court and the case

17    law as to examining the reasonableness of the decree and the

18    factors I should consider, there are three factors I

19    mentioned earlier; the technical feasibility to accomplish

20    the goal, to clean up the environment, whether it

21    sufficiently compensates the public for the costs or

22    remedial measures.  There was a discussion of costs and

23    attempts to control those by the D. C. Water authority.

24    But, at the same time, anyone who is familiar with the

25    Potomac River and uses the Potomac River knows what a

1    disaster it is after a large storm occurs in the District of

2    Columbia and the raw sewage that flows down the main river

3    flowing to the nation's capital.  And whether it reflects

4    the relative strength or weakness of the government's case

5    against the environmental offender.

6           It's a little different circumstance, the case I'm

7    citing, but it certainly does reflect that the parties

8    negotiate at arms length and reach this new agreement in

9    fairness and not through some collusion otherwise.  The case

10   I was referring to, *United States versus D.C.*, 933 F.Supp.

11   at 50, a 1996 case -- that actually is me citing another

12   Court of Appeals case.  I'm citing myself for authority.

13          The Court does recognize the expertise of the

14   agencies involved and has to rely upon that to some extent,

15   and that it seems to me, that having done that and reviewing

16   the materials that were submitted in some detail, as well as

17   the presentations of counsel and the consideration of the

18   responses by the interested parties and the public, that

19   it's appropriate to approve the first amendment to the

20   Consent Decree as submitted to the Court.

21          The copy that I have, I said, is one that is 48

22   page, with a signature page that's page 49, that then has, I

23   guess, attached another signature page to it.  The last

24   page, page 49, so that you don't have to rewrite, and get

25   all these signatures on it, it has me as still chief judge.

1    I appreciate that, but I relinquished that job some years

2    ago.  So I will take care of that and will issue the decree

3    today, approving the modifications in the first amendment,

4    first amended Consent Decree as fair, adequate and appropriate

5    in protecting the public interest, based upon the

6    representations and the understanding we have today what is

7    contained in the amended decree.

8            It's obviously everyone's hope that this works and

9    that the District can expeditiously proceed with the plan,

10   and hopefully it will be completed as per the agreement.

11           So I'll approve both the substantive changes on

12   the types of infrastructure to be used to control CSOs, that

13   is, green infrastructure, as well as the extension for five

14   years as necessary.  And if there are other issues that

15   arise -- and, obviously, the plaintiffs are still the

16   plaintiffs in the case, the Court still retains jurisdiction

17   over the matter and it can be brought to my attention.

18           Thank you all for your presentation.  I appreciate it.

19                          *   *   *

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of

7    my stenograph notes and is a full, true and complete

8    transcript of the proceedings to the best of my ability.

9                         Dated this 2nd day of February, 2016.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25